In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-16-00317-CR**
**NO. 09-16-00318-CR**
**NO. 09-16-00319-CR**
**NO. 09-16-00320-CR**

_____

**EBENESER BENNY MORONES, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 435th District Court**
**Montgomery County, Texas**
**Trial Cause Nos. 15-11-11633-CR, 15-11-11627-CR,**
**15-08-08136-CR and 15-11-11634-CR**

**MEMORANDUM OPINION**

A jury convicted appellant Ebeneser Benny Morones of unlawful possession

of a firearm by a felon, evading arrest or detention with a vehicle, aggravated assault

against a public servant, and possession of a controlled substance with intent to

deliver or manufacture, and the trial court assessed punishment at imprisonment for

life. In his sole appellate issue, Morones complains that the trial court abused its

1

discretion by admitting expert testimony and exhibits regarding toolmark identification, which is a form of firearm identification evidence, because the scientific techniques used by the witness were not shown to be reliable. We affirm the trial court's judgments.

FACTUAL BACKGROUND

Officer Robert Rodriguez, who formerly worked for the Woodbranch Police Department, testified that he observed a white Cadillac traveling at a high rate of speed on the highway. Rodriguez activated his patrol vehicle's lights and siren and began following the vehicle. Rodriguez realized that the driver was attempting to get away, and Rodriguez called dispatch and provided the vehicle's license plate number. According to Rodriguez, as the vehicle continued to drive, Morones put his head outside the window, pointed a gun at Rodriguez, and fired "a few rounds." Rodriguez testified that he feared imminent bodily injury. Rodriguez explained that he saw debris on his dashboard from glass that had broken. Rodriguez identified Morones as the shooter.

Rodriguez continued to follow the vehicle until Rodriguez's vehicle hit the curb and became disabled, forcing him to withdraw from the pursuit. Rodriguez testified that he heard through dispatch that other units were approaching. Rodriguez explained that he saw a police unit from Patton Village, and he believed other

officers were taking over the attempt to stop the vehicle. Rodriguez testified that his in-car video was turned on, and a copy of the video of the pursuit was admitted as an exhibit and published to the jury. Rodriguez testified that he subsequently identified Morones from a photograph.

Deputy Jeff Buchanan of the Montgomery County Precinct Four Constable's Office testified that he was on duty on the day that the vehicle failed to stop for Rodriguez. Buchanan explained that he joined in to assist with the pursuit. Buchanan was able to catch up to the chase at a point where the road opened up to three lanes, and he heard Rodriguez say on the radio that someone was shooting at him and his vehicle had been hit. Buchanan continued his attempt to locate the white Cadillac, and he eventually saw the vehicle, activated his lights and siren, and attempted to pull it over. Buchanan explained that the vehicle did not pull over, but continued down the highway, jumping off and onto the highway "at almost every exit and entrance ramp." According to Buchanan, the vehicle eventually left the interstate and feeder, and the pursuit "ended off of Hopper Road."

Buchanan testified that as the vehicle took the Hopper exit, he saw a male climbing out of the window on the back passenger side. Buchanan testified that the male pointed a semiautomatic pistol at him, and Buchanan heard shots. Buchanan explained that the male then picked up a rifle and again began firing at Buchanan

3

while the Cadillac was moving.[1] Buchanan testified that he could see the male's face, and he identified Morones as the shooter. Buchanan testified that he has "[z]ero doubt" that Morones is the person who was shooting at him. According to Buchanan, he accidentally shifted his car into a lower gear, and although he initially believed his vehicle was disabled, he resumed pursuing the Cadillac. Buchanan testified that he observed a red Conex box, which is a large metal container, and he saw a male, who he later realized was Morones, walking between the Conex box and a fence.

Buchanan explained that he subsequently found the Cadillac wrecked in a ditch, and he saw several people who had just gotten out of the vehicle running through a yard. Buchanan testified that he got out of his vehicle and "cleared the [Cadillac]" to make sure that no one was hiding in it. Inside the vehicle, Buchanan observed "[s]everal handguns, shotguns, what appeared to be body armor, and just junk all over the car." According to Buchanan, other officers eventually arrived, and they continued to search for the suspects who had fled the scene. Officers eventually apprehended two females and a male, and Buchanan learned that the male who had fired at Buchanan "had made the comment that he's not going back to jail alive." One of the female suspects subsequently provided Morones's name to the

---

[1]Buchanan explained that Morones was in Montgomery County when he fired at Rodriguez and in Harris County when he fired at Buchanan.

authorities. Buchanan explained that he learned during the investigation that he had been fired at two more times after he passed the Conex box, so Buchanan and another officer returned to the area, searched, and found casings that he believed were used in the shooting.

Buchanan explained that the Cadillac was inventoried at the scene. During the inventory, Buchanan and other officers found marijuana; pistol holsters; plastic bottles with baggies inside; an Altoids box, a plastic container filled with what officers believed were methamphetamines; a cigar box containing marijuana; a baggie containing methamphetamines; multiple digital scales in the backseat and back floorboard of the car; semiautomatic pistols; a shotgun on the backseat; a Derringer; ammunition; and a magazine for an M1 carbine rifle. Buchanan identified State's exhibit 131 as the M1 carbine rifle Morones was firing at him. Buchanan testified that six guns were recovered from the Cadillac, and an M1 carbine rifle was later found in Morones's possession. A redacted version of the video from Buchanan's patrol car was admitted as an exhibit and played for the jury. Deputy Brian Treille of the Montgomery County Sheriff's Department testified that he apprehended Morones at a hotel and found a semiautomatic .30-caliber rifle in the trunk of Morones's vehicle.

Dawn Laporte,[2] a Firearms Examiner II with the Harris County Institute of Forensic Sciences ("HCIFS"), testified that she has worked for HCIFS for four years. Laporte explained that prior to her employment with HCIFS, she worked for the Pasadena Police Department for approximately four years as a firearms examiner in training and then as a firearms examiner. Laporte explained that a Firearms Examiner II is able to review other examiners' cases, but a Firearms Examiner III is not. Laporte testified that she received a bachelor's degree in biology in 2006, and she has been trained by the National Firearms Examiner Academy. In addition, Laporte testified that she is in the process of obtaining her firearms certification through the Association of Firearm and Toolmark Examiners ("AFTE").

Laporte testified that she tests firearms for functionality, determines if fired evidence is traceable to a particular firearm, and reviews fired evidence to determine what firearm could possibly have fired the evidence. Laporte explained that she is familiar with several validation studies that are pertinent to firearms examination, including Glock Gen 4 bullet validation, 10 consecutively rifled Ruger 9 millimeter

---

[2]Before Laporte's testimony began, defense counsel stated, "It's my understanding that the State is about to call an expert witness, and I would like to, outside the presence of the jury, take on the witness under 702 and Daubert." The trial judge stated that she would first allow the State to establish the witness's qualifications and then permit the defense to voir dire the witness outside the jury's presence.

barrels, DVIS barrel validation, and 40 Smith & Wesson cartridge case isolated pair study. According to Laporte, validation studies are designed to test whether fired evidence that is matched to a firearm could have come from another firearm.

Laporte testified that she is published in the AFTE journal. Laporte explained that she is a member of AFTE and the Southwestern Association of Forensic Scientists, which are professional organizations, and she has attended professional conferences that pertain to firearms examination. Laporte testified that she has testified as an expert in firearms approximately fifteen times. According to Laporte, she bases the opinions in her reports on her training, which is validated through the scientific community.

The defense then took Laporte on voir dire. During voir dire, Laporte explained that ballistics study follows the AFTE theory of identification and involves determining whether fired evidence can be linked to the firearm that fired it based upon "the markings that are present from the firearm due to manufacturing." Laporte stated, "[I]f I determine that [fired evidence] goes to one gun, then it's a practical impossibility that it could go to any other firearm." Laporte explained that "practical impossibility" is the accepted term for describing the exclusion of all other firearms. Laporte stated that the scientific theory is subject to peer review. Laporte explained that the report she proposed to offer and the evidence upon which it is

based was reviewed by her peers. When asked to disclose any known potential rate of error, Laporte explained, "There is no real known rate of error in firearms. They're working on it right now. . . . As far as my errors, I have never made an error on a proficiency test or competency test. So my rate would be zero." Laporte stated that her body of work and the theories behind it are generally accepted.

After taking Laporte on voir dire, defense counsel asked that Laporte's testimony be barred, stating "I fear a couple of things could happen here with the inability to determine clear potential rates of error on the scientific theory[.]" Defense counsel further objected, "under Daubert we're missing one tenet, one tenet of the support [in] that we don't know what this error rate is because there really isn't one to declare it. . . . This is done very subjectively, Judge. And this is . . . much more prejudicial . . . than it is probative to the State's case." In response, the prosecutor stated that Laporte had explained that based on her training, experience, and articles that she has reviewed, written, and published, "this is the way that her forensic science works." The prosecutor pointed out that Laporte had previously testified fifteen times, and "even though . . . this type of science has somewhat subjective content to it, she is peer-reviewed by someone else who is similarly trained, and that this science is accepted in our community and is validated throughout the country."

8

The trial judge overruled defense counsel's objections under both Rule 403 of the Texas Rules of Evidence and *Daubert*. Laporte then testified that for Morones's case, she reviewed six firearms, fired cartridge cases, bullets, and bullet fragments. Laporte explained that after testing and examining the items, she prepared a report, in which she concluded that, "based on agreement of the combination of individual characteristics and all discernible class characteristics[,]" three of the items had been fired from the M1 30 carbine rifle.

During cross-examination, when asked to define toolmark, Laporte testified that, although she really does not "deal in toolmarks," "a toolmark would be the marks that are imparted on the bullet or the cartridge case." Laporte testified, "I'm a firearms examiner. I'm not a firearms and toolmark examiner." Laporte further explained, "Ballistics is just not what we do. The scope of what I do is under a microscope. . . . Ballistics is a totally different area." According to Laporte, the marks on the fired materials she tested were "consistent in class characteristics with the Universal M1[,]" and she determined that the chamber marks of the materials identified them as having been fired from the M1.

Sarah McCoy testified that she was in the car with Morones during the offense, and she explained that Morones was sitting in the backseat behind the passenger seat. According to McCoy, when a Montgomery County Constable

attempted to pull the car over, Morones stated that he intended to shoot the constable. McCoy testified that Morones then rolled the window down, hung out the back passenger-seat window, and shot at the police. McCoy explained that Morones eventually jumped out of the vehicle, and the car crashed. The State rested at the conclusion of McCoy's testimony.

MORONES'S ISSUE

In his sole appellate issue, Morones complains that the trial court abused its discretion by admitting Laporte's expert testimony and exhibits regarding toolmark identification, which is a form of firearm identification evidence, because the scientific techniques used were not shown to be reliable. We review the trial court's admission of expert testimony for an abuse of discretion. *See Coble v. State*, 330 S.W.3d 253, 272 (Tex. Crim. App. 2010). Assuming without deciding that the trial court erred by admitting the complained-of testimony from Laporte, we will turn to the issue of whether such alleged error is reversible.

Because the alleged error is not constitutional, we will reverse the trial court's judgment only if the error affected Morones's substantial rights. *See* Tex. R. App. P. 44.2(b). "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *Schmutz v. State*, 440 S.W.3d 29, 39 (Tex. Crim. App. 2014). Substantial rights are not affected by the erroneous

admission of evidence if, after examining the record as a whole, the appellate court has fair assurance that the error either did not influence the jury or had only a slight effect. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). The presence of overwhelming evidence of guilt may play a determinative role in resolving the issue of harm. *Id*. at 356.

Assuming without deciding that the trial court erred by admitting the complained-of testimony from Laporte, the jury heard testimony from two police officers who were chasing the Cadillac that Morones was the individual who fired shots during the pursuit. In addition, the trial court heard testimony from McCoy, in which she stated that Morones was sitting in the backseat on the passenger side and identified Morones as the shooter. Moreover, as discussed above, Morones was charged with four offenses: unlawful possession of a firearm by a felon, evading arrest or detention with a vehicle, aggravated assault against a public servant, and possession of a controlled substance with intent to deliver or manufacture, and the trial court assessed punishment at imprisonment for life. The act of possessing or using a firearm is not an element of evading arrest or detention or possession of a controlled substance with intent to deliver or manufacture. *See* Tex. Penal Code Ann. § 38.04(a), (b) (West Supp. 2016); Tex. Health & Safety Code Ann. § 481.112(a), (d) (West 2017). Furthermore, as to the offenses of aggravated assault against a

11

public servant and unlawful possession of a firearm by a felon, the State was not required to prove that Morones fired a particular firearm. *See* Tex. Penal Code Ann. § 22.01(a)(2), (b)(1) (West Supp. 2016); *Id.* § 22.02(a)(2), (b)(2) (West 2011); *Id.* 46.04(a)(1) (West 2011).

For all of these reasons, we have fair assurance that the admission of Laporte's testimony either did not influence the jury or had only a slight effect and, therefore, did not affect Morones's substantial rights. *See* Tex. R. App. P. 44.2(b); *Schmutz*, 440 S.W.3d at 39; *Motilla*, 78 S.W.3d at 355. Accordingly, we overrule Morones's sole issue and affirm the trial court's judgments.

AFFIRMED.

_____
STEVE McKEITHEN
Chief Justice

Submitted on October 26, 2017
Opinion Delivered November 22, 2017
Do Not Publish

Before McKeithen, C.J., Kreger and Horton, JJ.

12