Opinion filed July 26, 2018.



In The

# Eleventh Court of Appeals

_____

## No. 11-16-00210-CR

_____

## MICHAEL BOYD CROWLEY, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 42nd District Court**
**Taylor County, Texas**
**Trial Court Cause No. 25844A**

## M E M O R A N D U M   O P I N I O N

The jury convicted Michael Boyd Crowley of the murder of Lance Nickels, enhanced by one prior felony, and it assessed punishment at confinement for eighty years and no fine. The trial court sentenced Appellant accordingly. We affirm.

Appellant brings two issues on appeal. Appellant first argues that the trial court erred when it allowed Dr. Jason Dunham, a forensic psychologist, to testify regarding statements Appellant made during a sanity examination because use of the

testimony during trial violated both the Texas Code of Criminal Procedure and Appellant's Fifth Amendment privilege against self-incrimination. Appellant next contends that the trial court erred when it admitted Dr. Dunham's testimony because its probative value was outweighed by the danger of unfair prejudice in violation of Rule 403 of the Texas Rules of Evidence.

The witnesses before the jury tell the story of the events of the evening during which Appellant beat and kicked his friend Lance Nickels so severely that Nickels died a few days later. There is no challenge to the sufficiency of the evidence.

Appellant and Nickels were friends. In the evening hours on the date of the offense, Appellant got into a vehicle with Nickels and Nickels's girlfriend, Deanna McCullough. They all went to Nickels's house. There, they joined Deanna's daughter, Mindy McCullough, and her boyfriend, Shane Chudej. The group "hung out" and drank together in the living room.

During the first hour, "it seemed like everybody was all getting along." However, Deanna, Nickels, and Appellant began to argue. Appellant asked to use Nickels's truck, but Nickels would not let him. Appellant began yelling at Nickels. Deanna attempted to stop Appellant and Nickels from fighting; when she could not, she left Nickels's house to go get Appellant's mother. Mindy and Chudej went into a back bedroom.

Chudej was in the back bedroom with Mindy when he heard "scuffling and stuff moving around" and loud voices; it sounded like the argument "began to get more heated." Chudej and Mindy went into the living room, where they both heard Nickels call Appellant a "b---h." In response, Appellant began to hit Nickels.

Chudej saw Appellant hit Nickels fifteen to twenty times. At first, Nickels raised his hands to block Appellant's punches, but then "his hands kind of dropped." Mindy recalled that the first time that Appellant hit Nickels, "it knocked him out,"

but Appellant continued to kick Nickels "over and over." According to Mindy, it did not appear to "bother" Appellant that Nickels was unconscious as he continued to hit and kick him.

Chudej testified that "it looked like Nickels was . . . defenseless and bleeding"; he decided to call 9-1-1. Chudej was in the back bedroom and on the phone with a dispatcher when Appellant came to the bedroom doorway. Appellant asked Chudej if he was calling the police, and Chudej denied that he was.

Appellant went back to Nickels and started to punch and kick Nickels again. Chudej pulled Appellant off Nickels and tried to restrain him. When Chudej pulled Appellant off Nickels, Nickels was unconscious.

Chudej and Mindy attempted to calm Appellant, but Appellant went to the bedroom where Nickels and Deanna stayed. There, he flipped a mattress over and then grabbed a computer modem. Appellant walked back into the living room and hit Nickels one more time. Chudej recounted three separate instances in which Appellant attacked Nickels that evening; in total, Appellant "probably punched [Nickels] about 30 times, and he maybe kicked him 10 or 15 times." After Appellant hit Nickels that one last time, he said, "Tell Lance when he wakes up we will see who the b---h is," and he left.

After Appellant left, emergency responders arrived at Nickels's house and transported Nickels to Hendrick Medical Center. Nickels remained in the hospital for four days before he died from blunt force trauma of the head.

At some point before Appellant left Nickels's house, Appellant used his cell phone to take a photo of Nickels's beaten face. He sent the picture as a text message to an unknown number with the caption, "I hit him a couple times on this one, then f----d him up even worse," and he inserted a "grinning emoji."

Appellant also exchanged several text messages with his mother about the incident and Nickels's condition. When Appellant's mother informed him that Nickels was nonresponsive with brain injuries, Appellant responded, "I don't know my own strength." Appellant admitted to his mother, "I did get out of line with it. I do feel a little bad." Although Nickels had not yet died, Appellant considered the possibility of reducing any murder charges to manslaughter. He also attempted to devise an alibi with his mother, who informed him that the police had already been to Nickels's house. Appellant's mother warned him to erase the text messages from his phone.

After Appellant left Nickles's house, he went back to his own house. When he got there, his stepfather noticed that Appellant's hands were bloody. Appellant told his stepfather that Nickels called him a b---h and that he had beaten him up; he never mentioned that he was scared or that he had been attacked. Appellant was arrested the morning after the incident at Nickels's house.

In addition to the other witnesses that we have mentioned, Appellant testified at trial. According to Appellant, Nickels and Deanna wanted Appellant to join them in a robbery. Appellant attempted to leave, but when he walked to the door, Nickels pulled out a gun and told him that he could not leave. Appellant testified, "[T]hat's whenever I just flipped out on him." None of the other witnesses said that Nickels had a gun, and prior to his trial testimony, Appellant had never mentioned to anyone that Nickels had a gun or that Appellant was threatened.

Prior to trial, Appellant requested that the court order a psychiatric examination to assess his sanity at the time of the offense. The trial court ordered that Dr. Jason Dunham conduct the exam.

During the trial, Appellant did not raise an insanity defense. However, the State called Dr. Dunham to testify about the examination. Before Dr. Dunham

4

testified, Appellant objected to Dr. Dunham's testimony as "either extraneous or irrelevant or prejudicial more than probative." The trial court overruled Appellant's objection.

Dr. Dunham testified that, before the examination, he gave Appellant a "notification." Dr. Dunham explained to Appellant the purpose of the evaluation. He informed Appellant that he was appointed by the court to conduct the evaluation and that he therefore worked for the judge; that the interview was voluntary and could be terminated at any time; and that he would send a report with the results to the court, the district attorney, and Appellant's attorney. When Appellant indicated that he no longer felt comfortable talking about the incident, Dr. Dunham concluded the interview.

On direct examination, the State asked Dr. Dunham whether Appellant ever indicated that "he lost control of the circumstances, in his words, flipped out and went too far." Dr. Dunham replied, "Yes, he did." Dr. Dunham also explained that, other than intoxication, "[j]ust anger, would be the only other reason" for Appellant's actions. Finally, the State asked Dr. Dunham whether Appellant said to him, "I don't think it's normal to engage in a fight with somebody who is not fighting back." Dr. Dunham replied, "Yes, he did." Ultimately, Dr. Dunham determined that Appellant suffered no mental defect—beyond possible intoxication—that would cause him to lose rationality to the point that he did not realize that what he was doing was wrong. In this appeal, Appellant challenges the trial court's admission of these particular statements.

In his first issue, Appellant argues that the trial court's admission of Dr. Dunham's testimony was contrary to Article 46B.007 of the Texas Code of Criminal Procedure and to Appellant's Fifth Amendment right against self-incrimination as provided for in the United States Constitution. Even if we were to

hold that the trial court erred when it admitted Dr. Dunham's testimony, the error, if any, would not result in a reversal.

Constitutional error will result in a reversal of a conviction "unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment." TEX. R. APP. P. 44.2(a). We examine the entire record in a neutral light in order to determine whether a reasonable probability exists that the error moved the jury from "a state of nonpersuasion to one of persuasion as to the issue in question." *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000); *Friend v. State*, 473 S.W.3d 470, 483 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd).

We consider several nonexclusive factors when we determine whether a constitutional error has occurred. Those factors include the nature of the error, the extent that it was emphasized by the State, and the weight that a juror would probably place on the error. *Snowden v. State*, 353 S.W.3d 815, 822 (Tex. Crim. App. 2011). "At bottom, an analysis for whether a particular constitutional error is harmless should take into account any and every circumstance apparent in the record that logically informs an appellate determination whether 'beyond a reasonable doubt [that particular] error did not contribute to the conviction or punishment.'" *Id.* at 822 (alteration in original) (quoting TEX. R. APP. P. 44.2(a)). Although we do not focus on whether the jury verdict was supported by the evidence, the presence of "overwhelming evidence of guilt is a factor to be considered." *Motilla v. State*, 78 S.W.3d 352, 357 (Tex. Crim. App. 2002); *see Langham v. State*, 305 S.W.3d 568, 582 (Tex. Crim. App. 2010).

Appellant points to the self-incriminatory nature of Appellant's statements. However, these are not the only instances in which Appellant made self-incriminatory statements regarding his mental state. *Cf. Hutchison v. State*, 424

6

S.W.3d 164, 183–84 (Tex. App.—Texarkana 2014, no pet.) (holding that error in admitting a defendant's confession in violation of Fifth Amendment rights was not harmless when the confession was the only source of self-incriminating evidence on the issue of possession).

Significantly, Appellant sent a text message including a photo of Nickels's beaten face, with the caption, "I hit him a couple times on this one, then f----d him up even worse," followed by a "grinning emoji." Relative to the complained-of evidence, which was raised only in cross-examination of Appellant and never mentioned by the State in its closing arguments, this text message was heavily emphasized by the State. The State published the text message to the jury on numerous occasions, including during direct examination of the medical examiner— to prove that Appellant indeed did injure Nickels further than pictured—and also during closing arguments—to illustrate Appellant's "bragging" about the beating that he inflicted upon Nickels while Nickels lay unconscious.

Additionally, hours after leaving Nickels's house, Appellant admitted to his mother in a text message that he "did get out of line with it" and that he felt "a little bad" about it. Finally, during direct examination, Appellant told the jury that Nickels "pulled out his gun" and said that he was "not going to let [Appellant] leave." Appellant stated, "[T]hat's whenever I just flipped out on him, man." Appellant provided this statement without any reference to Dr. Dunham's testimony.

Those statements by Appellant were further corroborated by Mindy McCullough, who testified that Appellant "couldn't . . . control himself, like he was just angry." Mindy also testified that Appellant "snap[ped]," and she suggested that Appellant would not have acted the way that he did if he had not "drank any alcohol."

Appellant also argues that Dr. Dunham's testimony directly countered his issues of self-defense and manslaughter that the trial court submitted to the jury.

7

However, the State relied on extensive evidence to counter these issues without mentioning Dr. Dunham's testimony. In closing arguments, the State questioned the credibility of Appellant's testimony that Nickels had a gun by stressing that Appellant had never mentioned a gun until he testified at trial. Regarding the manslaughter instruction, the State focused on Appellant's belief, within hours of leaving Nickels's house, that Nickels had died, even though Nickels did not die until days later. Finally, the State again emphasized Appellant's text message, which included the photo of Nickels's beaten face and the statement that he "hit [Nickels] a couple times, then f----d [Nickels] up even worse."

The above-stated evidence is in addition to testimony from Chudej and Mindy that Appellant beat Nickels with his hands "over and over," "about 30 times to the head area" and kicked him "about 10 . . . or 15 times," even after Nickels had fallen unconscious and appeared defenseless.

We have considered all the evidence and the factors stated above, and we conclude beyond a reasonable doubt that, even if the trial court erred when it admitted Dr. Dunham's testimony, any such error did not contribute to Appellant's conviction or punishment and, therefore, is not reversible under Rule 44.2(a).

Appellant has also invoked the Texas Code of Criminal Procedure to challenge the admissibility of the testimony about the sanity examination. Any such error would be statutory, and we would disregard the error unless it affected Appellant's substantial rights. TEX. R. APP. P. 44.2(b). However, we need not conduct a harm analysis under Rule 44.2(b). Because a harm analysis under Rule 44.2(a) is more stringent, it is unnecessary for us to conduct a separate one. See *Guidry v. State*, 9 S.W.3d 133, 151 n.14 (Tex. Crim. App. 1999). Appellant's first issue is overruled.

8

In his second issue, Appellant argues that the trial court erred when it allowed Dr. Dunham to testify because the prejudicial effect of his testimony outweighed its probative value. As a preliminary matter, the State argues that Appellant failed to preserve this argument at trial. We will assume, without deciding, that Dr. Dunham's testimony was admitted in violation of Rule 403 and that Appellant appropriately preserved the trial court's error; we thus turn to a harm analysis.

The erroneous admission of evidence generally constitutes nonconstitutional error. *See Motilla*, 78 S.W.3d at 355. We must disregard a nonconstitutional error if it does not affect substantial rights. TEX. R. APP. P. 44.2(b). "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *Schmutz v. State*, 440 S.W.3d 29, 39 (Tex. Crim. App. 2014). "[S]ubstantial rights are not affected by the erroneous admission of evidence 'if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect.'" *Motilla*, 78 S.W.3d at 355 (quoting *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001)). In assessing the likelihood that the jury's decision was adversely affected by the error, we must "consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case." *Id.*

We have already held that the complained-of testimony did not contribute to Appellant's conviction or punishment. Furthermore, the State presented ample evidence of Appellant's guilt. Both Chudej and Mindy testified that Appellant punched Nickels approximately twenty or thirty times and kicked him at least ten times, in three separate instances, even after Nickels appeared defenseless and then unconscious. Both testified that Appellant beat Nickels after Nickels called him a

"b---h." In a text message that included a photograph of Nickels's beaten face, Appellant admitted that he "hit [Nickels] a couple times . . . then f----d him up even worse." Appellant's second issue is overruled.

We affirm the judgment of the trial court.


JIM R. WRIGHT

SENIOR CHIEF JUSTICE


July 26, 2018

Panel consists of: Willson, J.,
Bailey, J., and Wright, S.C.J.[1]

---

[1]Jim R. Wright, Senior Chief Justice (Retired), Court of Appeals, 11th District of Texas at Eastland, sitting by assignment.