COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| THOMAS COMPTOIS, | § | |
| | | No. 08-16-00240-CR |
| Appellant, | § | |
| | | Appeal from the |
| v. | § | |
| | | 120th District Court |
| THE STATE OF TEXAS, | § | |
| | | of El Paso County, Texas |
| Appellee. | § | |
| | | (TC# 20150D05389) |
| | § | |

# **O P I N I O N**

A jury convicted Thomas Comptois of aggravated assault with a deadly weapon[1] and sentenced him to two years' incarceration. His appeal challenges admission of evidence pertaining to a "1%" tattoo visible on his hand which was introduced during the guilt/innocence phase of trial. Comptois asserts the trial court erred by impermissibly allowing the State to introduce testimony of the tattoo's affiliation with a motorcycle gang. Comptois claims the evidence was irrelevant, overly prejudicial, and used as character-conforming proof. Thus, he claims, the evidentiary error of admitting the tattoo evidence had a harmful effect on the jury's verdict. We affirm.

---

[1] *See* TEX. PENAL CODE ANN. § 22.02(a)(2) (West 2011). The two-paragraph indictment charged Comptois with intentionally, knowingly, or recklessly causing bodily injury to Martinez by striking him with: (A) a pipe, and (B) a chrome cylinder.

## BACKGROUND

### The State's Case

The complainant in this case, Jesus Martinez III, testified at trial to the following: on September 2, 2015, he was driving to work on Interstate 10 in El Paso, Texas, when he encountered a white pickup truck traveling in the same direction in the adjacent lane. The driver of the truck was later identified as Comptois. Martinez noticed the driver of the truck was "revving" his vehicle and then flashed him his middle finger. Martinez returned the gesture, but he didn't know what had prompted their exchange. Martinez testified he tried to avoid Comptois by driving away from him and changing lanes several times. Nonetheless, Comptois followed and swerved at him. Afraid that Comptois would follow him to work, Martinez passed his usual exit, drove further, then pulled into a gas station on Airway. Comptois followed him to the station and both parties exited their vehicles.

Comptois walked over to Martinez, and before they spoke, Comptois immediately struck Martinez on his forehead with a "pipe object." Martinez felt stunned. As he recovered from the blow, Martinez felt disbelief and told Comptois he was going to call the police. Comptois responded, "Go ahead. It's not the first time I've been in jail." Martinez unsuccessfully tried to take away the pipe that Comptois held but he reached out with his arm and pushed him away. Comptois walked back to his truck and started to drive away. Martinez wanted to prevent him from leaving without information. To stop him, Martinez punched the back window of the truck. Again, Comptois exited his vehicle with the pipe and told Martinez he would "f*cking end [him]." Martinez testified he tried to grab the pipe but Comptois successfully pushed him away and went back to his truck. Martinez then ran to his vehicle, grabbed his phone, and successfully took a

2

picture of the truck's license plate just before Comptois drove away. The State later admitted into evidence the photograph of the plate.

After Comptois left the scene, Martinez panicked that his phone did not have service. Wanting to call police, he found a nearby bystander who used his own phone to make the call for him. The State introduced the 911 call through the custodian of records. On the call, the bystander reported that he saw that Martinez was assaulted with a "lead pipe," and the other driver left the scene in his truck. He also described that Martinez was standing with him and was bleeding from his forehead. As the operator asked questions, the bystander described that he saw Comptois had been wearing a black and red shirt with a Western Tech logo on it and he gave a general description of his height and build. The bystander then handed his phone to Martinez.

On the call, Martinez provided the license plate number, a physical description of Comptois, and mentioned not only that Comptois was wearing a Western Tech shirt, but also that he had seen tattoos on him. Martinez described that he didn't know his attacker, but he had been followed by him from Interstate 10 to the gas station. Martinez described that he got out of his car to talk. The other driver then struck him with a big solid pipe. As the call ended, police sirens could be heard in the background. At trial, Martinez testified he went for treatment as his wound required stitches. The State then admitted photographs of a gash on Martinez's forehead, before and after treatment, and copies of his medical records. Martinez also testified that he identified Comptois to police from a photograph line-up.

The State next called the manager of the gas station who testified he was looking out his window when he noticed a silver car pull into the station followed by a white pickup truck. The manager watched as the "tall guy, skinny, bald" got out of the silver vehicle and a "short, heavyset

3

[driver] . . . wearing like a red shirt" got out of the truck and they met about halfway in front of the vehicles. The manager testified he saw the guy wearing a red shirt pull out a "long chrome metal object" and struck the other driver. He also confirmed he never saw the driver of the car (Martinez) hit the other driver (Comptois) neither before nor after he had been struck. He further described seeing Martinez take a picture of the license plate just before the truck drove away. During the manager's testimony, the State also presented a surveillance video which captured the altercation at the station on the far side of the pumps. In the video, Martinez can be seen parking his vehicle first, with Comptois pulling up soon after. Both parties are seen interacting outside their vehicles, although the view is partially blocked by a pole near the pumps. Following the manager's testimony, the State called two investigating officers then rested.

### The Defense's Case

Comptois testified during the defense's case-in-chief. Comptois began by describing he was retired from the U.S. Army and worked as a certified mobile mechanic on motorcycles. Comptois introduced into evidence a photograph of "a Maglite flashlight, two D-cell," which he said he had with him on the morning in question. While testifying, Comptois admitted he was driving a truck with the plate that was shown in the photograph.

Comptois described that he was driving on Interstate 10, planning on going to a Starbucks on Airway, when he saw Martinez make an obscene gesture at him and swerve towards his truck. Comptois also testified that Martinez brandished a small black pistol at him. Wanting an explanation, Comptois followed behind Martinez to the Airway exit and parked next to him at a gas station. As they parked, Comptois testified that Martinez immediately started running toward his truck. Noting that Martinez appeared to be "twice [his] size," Comptois grabbed a work

4

flashlight and as he met him outside his truck, he then struck him. Comptois claimed he had feared for his life. After the incident, he testified he went home and did not call police to report anything.

*Testimony Regarding Comptois's Tattoo*

On cross-examination, the State asked Comptois about his visible tattoos without the defense objecting. Comptois gave a description of several he had on his right hand that were dedicated to a friend who had died five years earlier in combat. Without objection, the prosecutor pressed him about another tattoo he did not mention in his explanation. Comptois responded, "I have [a] one percenter tattoo on my right hand." To comply with a motion in limine, the State then asked to approach the bench before asking further questions. During the ensuing bench conference, the prosecutor announced her intent to question Comptois about his purported membership in the Bandidos motorcycle gang, which she argued was represented by the one percent tattoo on his hand.

The prosecutor argued that Comptois opened the door to her line of questioning by his testimony about being a military veteran. Without additional questioning, she argued his testimony would leave a false impression with the jury. Defense counsel responded that Comptois had answered the question identifying the tattoo and any further testimony would be irrelevant. Defense counsel also argued that Comptois was not being charged with engaging in organized criminal activity to commit assault, and thus, his affiliation with any organization had no relevance to the incident that occurred. In reply, the prosecutor argued that his membership was not only relevant but also probative of his motive and mindset in following Martinez and thereafter attacking him being that the conduct was consistent with his one percent membership.

5

Although the trial court sustained the objection, the court allowed the prosecutor to narrowly ask Comptois about the meaning of the tattoo at issue. When the prosecutor returned to questioning and asked Comptois what his tattoo meant, he responded it meant he belonged to "a one percent motorcycle club whose lives rotate around their motorcycles." Explaining further, he said, "we're the one percent of people out there who dedicate our lives to our motorcycles and living that kind of lifestyle." The prosecutor then left the topic and asked other questions.

*State's Rebuttal Witness*

After the defense rested, the State approached the bench for a conference and informed the court that it intended to call Officer Francisco Balderrama as a rebuttal witness to testify about the meaning of the one percent tattoo. The prosecutor explained that Officer Balderrama was an expert on gangs and he would rebut the testimony given by Comptois about the meaning of the tattoo at issue. The defense objected asserting that Officer Balderrama's testimony would not be relevant and was inadmissible under Texas Rules of Evidence 403 and 404. The defense also objected to lack of notice. The State responded that the officer's testimony would not be offered to show that Comptois acted in conformity to his character, but rather to show motive for the assault and to rebut Comptois's theory of self-defense which it claimed had rendered the testimony relevant. Ruling on objections, the trial court stated that the proposed testimony, while prejudicial, was not a surprise to the defense. Additionally, the court ruled the evidence was relevant to the question of who the aggressor was and allowed the State to present Officer Balderrama's testimony limited to the meaning of the tattoo but not any other characteristics of the gang associated with it.

Thereafter, when called, Officer Balderrama testified he was assigned to the unit of the El

6

Paso Police Department that investigates organized crime. He described that he had received training in the recognition of criminal street gangs and he was aware of Comptois being a member of the "one percenter motorcycle club" in El Paso. Over the defense's objection, Officer Balderrama testified the term "one percent" refers to an outlaw motorcycle gang and originated as of 1947. Balderrama testified that the term arose from a statement made by someone from the American Motorcycle Association (AMA) after a riot had occurred in Hollister, California, involving several motorcycle clubs. The AMA statement to the media claimed that ninety-nine percent of motorcycle riders were law-abiding citizens. Balderrama then testified that the one percenters were "the outlaw motorcycle gangs, [who] took that one percent to heart[.]" Members, he described, wear that one percent over their heart on their motorcycle vests. No other questions were asked, and both the State and defense then rested.

The jury was charged on self-defense and given other instructions. During its closing, the State argued that Comptois had lied about his version of events and that his testimony was inconsistent with evidence presented. The prosecutor repeatedly mentioned that Comptois was a "one percenter" or had a one percent tattoo, and argued, *inter alia*, that Comptois committed the aggravated assault because he was a one percenter who did not like being disrespected. The jury convicted Comptois and sentenced him to two years' incarceration. This appeal follows.

## DISCUSSION

In three issues, Comptois challenges the trial court's decision to admit testimony regarding his "1%" tattoo. In his first issue, he argues that the testimony the State elicited from him on cross-examination was irrelevant. In his second and third issues, he challenges the rebuttal testimony from Officer Balderrama, arguing it was irrelevant, unfairly prejudicial, and consisted

7

of improper conformity-with-character testimony in violation of Rule 404(a) and (b) of the Texas Rules of Evidence. Given their commonality, all three issues will be addressed together.

### Did Error Occur?

A trial court's decision to admit evidence is reviewed for abuse of discretion. *Montgomery v. State*, 810 S.W.2d 372, 378–79, 391 (Tex. Crim. App. 1990) (op. on reh'g). As such, we will uphold the trial court's decision to admit or exclude evidence if it falls in the zone of reasonable disagreement, and we afford "great discretion" to a trial court in its decision to admit evidence and give corresponding deference to its evidentiary decisions. *See id*.

On appeal, the State does not contest that the trial court erred when it admitted the following testimony over Rule 403 and relevance objections: (1) Comptois's explanation of the meaning of the "1%" tattoo; and (2) Officer Balderrama's testimony, as a gang expert, rebutting Comptois on the meaning of the "1%" tattoo. *See* TEX. R. EVID. 404(b). In particular, the State admits that it used the tattoo testimony to show Comptois's motive for committing the assault, and to argue that "one percenters" are violent and will assault anybody who is disrespecting them. The State conceded that "this type of evidence falls squarely under the character-conformity-evidence prohibition of Rule 404(b), and such testimony should not have been allowed into evidence at the guilt-innocence stage of trial."

Our review of the evidence yields a similar result. We find that testimony describing the nature and character of the "1%" tattoo and linking it to an "outlaw motorcycle gang" (1) was irrelevant as it did not make any fact of consequence more or less likely than it would be without the evidence; (2) had low probative value which was substantially outweighed by the risk of unfair prejudice; and (3) was offered for an improper conformity-with-character purpose in violation of

8

Rule 404(b). *See* TEX. R. EVID. 401, 403, 404(b); *see also Pondexter v. State*, 942 S.W.2d 577, 584 (Tex. Crim. App. 1996) (trial court erred in admitting evidence of defendant's gang membership because it was irrelevant under Rule 401 and was used for an improper conformity-with-character purpose in violation of Rule 404(b)). As such, we conclude the trial court erred in admitting the complained-of evidence at the guilt-innocence stage of trial.

### Does Reversible Harm Exist?

*General Law*

Having determined that the trial court erred by admitting testimony regarding Comptois's "1%" tattoo, we now consider whether the error required reversal. Non-constitutional error, such as the erroneous admission of evidence, must be disregarded unless it affects the defendant's "substantial rights." TEX. R. APP. P. 44.2(b); *Barshaw v. State*, 342 S.W.3d 91, 93–94 (Tex. Crim. App. 2011). We do not overturn a criminal conviction for non-constitutional error if, after examining the record as a whole, we have fair assurance that the error did not influence the jury or had only a slight effect. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002); *Jenkins v. State*, No. 08-15-00366-CR, 2017 WL 3614213, at *9 (Tex. App.—El Paso Aug. 23, 2017, no pet.) (not designated for publication). On the other hand, we must reverse a conviction for non-constitutional error if we have "grave doubt" that the result of the trial was free from the substantial effect of the error. *Barshaw*, 342 S.W.3d at 94. "Grave doubt" means that "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *Id*. (citation omitted). As such, "in cases of grave doubt as to harmlessness the petitioner must win." *Id*. (citation omitted). The presence of overwhelming guilt, on the other hand, may be sufficient to sustain a conviction in a case where harmless error analysis is

implicated. *Motilla*, 78 S.W.3d at 357, 360. In reviewing the entire record, we consider: (1) testimony or physical evidence admitted for the jury's consideration; (2) the nature of the evidence supporting the verdict; (3) the character of the alleged error and how it might be considered in connection with other evidence in the case; (4) the jury instructions; (5) the State's theory and any defensive theories; (6) closing arguments; (7) voir dire; (8) whether the State emphasized the error; and (9) whether overwhelming evidence of guilt exists. *Id.* at 355–58.

*Analysis*

In establishing Comptois's guilt, it is evident that the State placed some emphasis on testimony about his "1%" tattoo and his purported membership in an outlaw motorcycle gang. Indeed, in its briefing, the State admits that the prosecutor mentioned that Comptois was a "one percenter" or otherwise referenced his "one percent" tattoo eleven separate times in her closing argument. On those occasions, we find the prosecutor made one of the following types of arguments: (1) that Comptois assaulted Martinez "for disrespecting him on the road, because he's living out that tattoo on his hand;" (2) that Comptois is "a one percenter;" (3) that Comptois was "an assaultive one percenter;" (4) that Comptois had the one percenter tattoo on his hand "so anyone who comes in contact with him knows who they're dealing with, knows that he is an outlaw criminal motorcycle gang member;" and (5) that Comptois "was looking for an opportunity to teach Mr. Martinez a lesson, because that's what a one percenter does." Nonetheless, after examining the record as a whole, we find the overwhelming evidence presented as to Comptois's guilt outweighed the impact of the testimony about the tattoo and the State's closing argument. Thus, we conclude there is fair assurance shown by the record that the error did not influence the jury or did so only slightly. *See Barshaw*, 342 S.W.3d at 94.

With ample evidence, the State established guilt by presentation of the following: (1) Martinez's description of being assaulted, and his injury and treatment; (2) the 911 call placed by a bystander who confirmed he saw Martinez getting assaulted with something that looked like a lead pipe by a man driving a truck; (3) the photograph of the license plate of Comptois's truck taken by Martinez; (4) eyewitness testimony from the gas station manager and the video surveillance footage, both of which corroborated Martinez's version of events; (5) Comptois's admission that he struck Martinez with his work flashlight without adequate provocation; and (6) Comptois's admission of a photograph of a Maglite flashlight he claimed he used to strike Martinez. Clearly, the corroborated evidence established Comptois's guilt on the charge of aggravated assault against Martinez with a deadly weapon. Comptois himself did not contest neither his identification as the person who had struck Martinez on the date in question nor the nature of the offense charged. Thus, we conclude that the tattoo evidence had no probative impact in linking Comptois to the incident or to its assaultive character.

At trial, Comptois presented a theory of self-defense claiming he acted out of fear for his life when he stuck Martinez with his flashlight. Comptois's version of events, however, contained several contradictions and implausibilities which the State highlighted for the jury. For example, although Comptois claimed that Martinez had earlier brandished a firearm while they traveled in their vehicles, he admitted that he followed Martinez for several miles then parked next to him. At the station, he claimed he immediately struck Martinez as the two approached each other. Although Comptois claimed he feared for his life, he based his fear not on any claim of Martinez brandishing a weapon, but rather, on having a height disadvantage. After being instructed on the law of self-defense, the jury was not persuaded by Comptois's testimony.

11

The State presented evidence of the assault through Martinez's testimony, photographs of his head wound, his medical records, the 911 recording, the manager's testimony, and the surveillance footage from the gas station's security camera, all of which supported the State's theory that Comptois assaulted Martinez and did not act in self-defense. The evidence about Comptois's tattoo and its association with an outlaw motorcycle gang was presented in a tight and narrow fashion. Officer Balderrama described the origin of the term "one percenter," but never mentioned the club by name nor any of its activities. Considering the entire record, the evidence of Comptois having a purported affiliation with a motorcycle gang was minimal and did not include emotionally charged testimony. Taken together, the evidence supported the conviction and weighed in favor of affirming the judgment. *See Motilla*, 78 S.W.3d at 356–58.

Having reviewed the record as a whole, we find the erroneous admission of evidence explaining the meaning of the "1%" tattoo, and related testimony about purported membership in an outlaw motorcycle gang, did not have such an emotional effect on the jury that it was unable to rationally consider the contested issues and evidence before it. Therefore, we conclude that substantial rights of Comptois were not affected and we must disregard the error. *See* TEX. R. APP. P. 44.2(b); *Motilla*, 78 S.W.3d at 356–58; *see also Gonzalez v. State*, 544 S.W.3d 363, 375 (Tex. Crim. App. 2018) (finding harmless error in erroneous admission of drug evidence where the conviction was supported by eyewitness testimony, and defendant's credibility was called into question by inconsistencies in the defendant's testimony); *Salinas v. State*, No. 04-07-00492-CR, 2008 WL 4163203, at *2 (Tex. App.—San Antonio Sept. 10, 2008, pet. ref'd) (mem. op.) (not designated for publication) (concluding that even if gang-related evidence was erroneously admitted, eyewitness testimony corroborating the defendant's guilt was sufficient to support a

finding of harmless error); *Watson v. State*, No. 05-09-00136-CR, 2011 WL 1227149, at *3–4 (Tex. App.—Dallas Apr. 4, 2011, pet. ref'd) (not designated for publication) (concluding that even if evidence of defendant's gang membership was erroneously admitted, such error would have been harmless because of the presence of eyewitness testimony and other substantial evidence supporting the conviction).

Accordingly, Comptois's first, second, and third issues are overruled.

## CONCLUSION

We affirm the judgment of the trial court.


GINA M. PALAFOX, Justice

August 24, 2018

Before Rodriguez, J., Palafox, J., and Larsen, J. (Senior Judge)
Larsen, J. (Senior Judge), sitting by assignment

(Do Not Publish)