**Freddie MOTILLA, Appellant,**

v.

**The STATE of Texas.**

No. 598–01.

Court of Criminal Appeals of Texas.

June 26, 2002.

**19.** *Camacho v. State*, 864 S.W.2d 524, 532 (Tex.Crim.App.1993).

**20.** *Wesbrook v. State*, 29 S.W.3d 103, 114–115 (Tex.Crim.App.2000).

Kenneth P. Mingledorff, Houston, for Appellant.

S. Elaine Roch, Asst. DA, Houston, Matthew Paul, State's Atty., Austin, for State.

## OPINION

KEASLER, J., delivered the opinion of the Court, joined by KELLER, P.J., and PRICE, WOMACK, HERVEY, HOLCOMB, and COCHRAN, J.J.

In a harm analysis under Rule 44.2(b), is an appellate court required to disregard

overwhelming evidence of the defendant's guilt? The answer is no. We reaffirm our previous holdings that an appellate court can and should consider overwhelming evidence of guilt in a harm analysis.

## I. Facts and Procedural History

Ronnie Fisk was 20 years old when he celebrated New Year's Eve of 1997 at the Far West Rodeo Club with his friends Jose Osuna and Cesar Martinez. The club closed at 2:00 a.m., and the trio headed to the Shell Station on the other side of the freeway to continue drinking and listening to music with a crowd of revelers.

Within about fifteen minutes, teenagers Freddie Motilla and Ramon Flores approached Fisk's group, and the New Year's celebration turned deadly. Motilla had a gun. He pointed the gun at Fisk and his friends, told them to get on the ground, and demanded the keys to the car. Flores told Motilla to "get the guy with the trunk"; at that point, Fisk was standing beside the trunk. Motilla grabbed Martinez by the arm and tried to throw him to the ground, all the while keeping the gun pointed at Fisk. When Motilla let go of Martinez's arm, Martinez and Osuna started running. As they ran away, they heard two or three gunshots and they heard Fisk yell. After they had escaped the vicinity, they stopped running and looked back. Osuna saw Fisk run briefly and then saw him begin to fall to the ground. Martinez saw Fisk fall to the ground facedown and saw Motilla and Flores run away.

Eventually, Martinez and Osuna returned to Fisk's side. Blood was coming out of Fisk's chest. They then looked around to see if Motilla and Flores had taken anything. Martinez found the keys to the car in the trunk and put them in his pocket. Just when it seemed the nightmare was over, Motilla and Flores re-turned. Motilla put his gun to Martinez's head and demanded the keys to the car, but Martinez said he didn't know where the keys were. Then Motilla put his gun to Osuna's head and demanded the gold chain around Osuna's neck. Osuna handed it over. Meanwhile, Flores searched Fisk's pockets for the keys. When Flores came up empty-handed, Motilla and Flores ran away, this time for good. Martinez went back to Fisk and held him as his friend died in his arms.

When investigators arrived at the scene, the pocket of Fisk's jeans was pulled inside out. In addition, they found two spent shell casings and one fired bullet, all fired from a 9 millimeter firearm. The two spent shell casings were clearly from the same 9 millimeter, but tests could not confirm whether the fired bullet was also from that firearm. Motilla's gun was never found. The autopsy concluded that Fisk was killed by a single gunshot wound to back of his right arm which went through his right rib and lung, through his aorta, and exited through the upper left chest.

Osuna and Martinez later identified Motilla in a photo spread, and Motilla was arrested. After receiving his warnings from a magistrate, Motilla was interviewed by the police. During the interview, he admitted to shooting and robbing a man, but said that he was "drunk and didn't know what he was doing." Motilla's responses during the interview were consistently mumbled, nearly inaudible, and mostly monosyllabic.

Toward the end of its case at the guilt-innocence phase, the State presented the testimony of Fisk's mother. She told the jury that she had adopted Fisk when he was a baby. Back then, she had been a volunteer at Texas Children's Hospital and Fisk had been a sick child there. She took him into her home when he was 13 months

old and formally adopted him when he was 3. She was a single parent who raised five children, including Fisk. She also testified that Fisk had a twin brother whom she did not raise. Motilla objected to this testimony on the grounds that it was irrelevant and more prejudicial than probative. The trial court overruled the objection.

The jury convicted Motilla of capital murder. Because he was a juvenile when he committed the offense, the trial court sentenced him automatically to life in prison.[1]

## II. Court of Appeals

Motilla appealed the conviction arguing that the evidence was legally and factually insufficient and that the trial judge erred by allowing the testimony of Fisk's mother because it was irrelevant and it was more prejudicial than probative. The Court of Appeals found the evidence sufficient but agreed with Motilla that the trial judge erred in admitting the testimony of Fisk's mother.[2] The two-judge majority then conducted a harm analysis and concluded that the admission of the evidence "did influence the jury."[3] The appellate court reasoned that the evidence of Motilla's specific intent to kill was "scant" and, therefore, the court could not "help but feel that the irrelevant testimony of ... [Fisk's] mother contributed to the jury's conviction."[4]

Justice Anderson dissented, arguing that the majority's opinion was internally inconsistent in holding that the evidence of intent was sufficient to convict but so weak as to render the erroneous admission of evidence harmful.[5] He contended that the evidence of Motilla's intent was strong and that the erroneously admitted evidence "had a de minimis affect [sic] on the jury."[6]

We granted the State's petition for discretionary review to address the appellate court's harm analysis.

## III. Analysis

 Texas Rule of Appellate Procedure 44.2(b) provides that a nonconstitutional error "that does not affect substantial rights must be disregarded."[7] We have determined that substantial rights are not affected by the erroneous admission of evidence "if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect."[8] In assessing the likelihood that the jury's decision was adversely affected by the error, the appellate court should consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case.[9] The reviewing court may also consider the jury instructions, the State's theory and any defensive theories, closing arguments and even voir

---

1. *See* TEX. PENAL CODE § 8.07(c) (Vernon Supp. 2002).

2. *Motilla v. State,* 38 S.W.3d 821, 824–26 (Tex.App.-Houston [14th Dist.]2001).

3. *Id.* at 827.

4. *Id.*

5. *Id.* at 830 (Anderson, J., dissenting).

6. *Id.*

7. TEX.R.APP. P. 44.2(b).

8. *Solomon v. State,* 49 S.W.3d 356, 365 (Tex. Crim.App.2001); *Johnson v. State,* 967 S.W.2d 410, 417 (Tex.Crim.App.1998).

9. *Morales v. State,* 32 S.W.3d 862, 867 (Tex. Crim.App.2000).

dire, if applicable.[10] We have also recognized that whether the State emphasized the error can be a factor.[11]

The Court of Appeals indicated its belief that a reviewing court "should not focus on the weight of other evidence of guilt" in conducting a harm analysis, stating that "a sufficiency of the evidence determination has no place in a harm analysis."[12] The Court relied on our opinions in *Harris v. State*[13] and *Atkinson v. State*[14] for this proposition.

But the Court of Appeals misinterpreted those decisions. In *Harris*, we discussed harmless error analysis under former Rule 81(b)(2). We explained that a reviewing court's responsibility "transcends determining whether the conviction was correct."[15] We stated that to conduct a harm analysis by asking "was there overwhelming evidence of guilt that was not tarnished by the error?" was incorrect "because the language of the rule focuses upon the error and not the remaining evidence."[16] And we cautioned against the danger of "applying only that standard."[17]

But we also conceded that "it is absurd to suggest that an appellate court can insulate itself from the reality of the record."[18] We acknowledged the Supreme Court's language in *Kotteakos v. United States*[19] that "[t]o weigh the error's effect against the entire setting of the record without relation to the verdict or judgment would be almost to work in a vacuum."[20] We stated that "it is impossible to gauge the significance of the error apart from the remaining properly admitted evidence. This approach obviously implicates a review of the evidence, but the concern is solely to trace the impact of the error."[21] After setting forth some confusing and somewhat conflicting authority from the United States Supreme Court, we concluded by stating that "an appellate court should not determine the harmfulness of an error simply by examining whether there exists overwhelming evidence to support the defendant's guilt ... Rather, the appellate court should calculate as much as possible the probable impact of the error on the jury in light of the existence of the other evidence."[22] We then acknowledged that "this is a distinction without a difference" and that "[i]n both instances, the presence of overwhelming evidence of guilt plays a determinative role in resolving the issue."[23] We concluded by "recognizing that overwhelming evidence can be a factor to be considered."[24]

After *Harris*, some courts,[25] including

---

10. *Id.; see also Llamas v. State,* 12 S.W.3d 469, 471 (Tex.Crim.App.2000).

11. *King v. State,* 953 S.W.2d 266, 272 (Tex. Crim.App.1997).

12. *Motilla,* 38 S.W.3d at 827 n. 1.

13. 790 S.W.2d 568 (Tex.Crim.App.1989).

14. 923 S.W.2d 21 (Tex.Crim.App.1996).

15. 790 S.W.2d at 585.

16. *Id.*

17. *Id.*

18. *Id.*

19. 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

20. *Harris,* 790 S.W.2d at 585, *quoting Kotteakos,* 328 U.S. at 764, 66 S.Ct. 1239.

21. *Id.* at 585–86.

22. *Id.* at 587.

23. *Id.*

24. *Id.* at 588.

25. *See, e.g., Sanford v. State,* 21 S.W.3d 337, 346 (Tex.App.-El Paso 2000, no pet.) (*"Harris* plainly states that the reviewing court may not find an error harmless due to the exis-

our own in *Atkinson*,[26] concluded that an appellate court should not consider overwhelming evidence of guilt in conducting a harm analysis under Rule 81(b)(2). But that is obviously not what we said in *Harris*. On the contrary, we made clear that an appellate court should consider overwhelming evidence of guilt, but that that should be only one factor in the analysis.[27] We never precluded courts from considering evidence of the defendant's guilt in analyzing harm under former Rule 81(b)(2).

■ The question remains whether our conclusion in *Harris*, that overwhelming evidence of guilt is a factor to be considered under a Rule 81(b)(2) analysis, applies to a harm analysis conducted under the current rules. With respect to Rule 44.2(a), the answer is clearly "yes." We have already held that, in a harm analysis under Rule 44.2(a), "the presence of overwhelming evidence supporting the finding in question can be a factor in the evaluation of harmless error."[28] Though we have not stated this principle in so many words with regard to Rule 44.2(b), our holdings nevertheless reflect that it is true for that rule as well.

In *King v. State*,[29] we considered the erroneous admission of pen packets at the punishment phase of a capital murder trial. In finding the error harmless under Rule 44.2(b), we considered all of the evidence of future dangerousness that had been admitted at both guilt/innocence and punishment.[30] In *Ladd v. State*,[31] we found extraneous offense evidence to be properly admitted. But even assuming that the admission of the evidence was error, we concluded that it was harmless under Rule 44.2(b) because, "given all of the evidence before the jury," it was unlikely that the admission of the evidence had a substantial effect on the jury's verdict.[32]

In *Morales v. State*, we discussed at length the proper harm analysis under Rule 44.2(b) when a piece of evidence is erroneously excluded.[33] We stated that an "appellate court should consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case."[34] We further stated that "[w]hen the claimed error is the exclu-

---

tence of overwhelming evidence of guilt"; refusing to apply *Harris* to Rule 44.2(b) analysis); *Hicks v. State*, 815 S.W.2d 299, 303 (Tex.App.-Houston [1st Dist.] 1991, no pet.) (refusing to consider overwhelming evidence of guilt in Rule 81(b)(2) analysis).

**26.** 923 S.W.2d at 26 (whether evidence sufficiently establishes guilt not dispositive under Rule 81(b)(2)); *see also Wilson v. State*, 938 S.W.2d 57, 61 (Tex.Crim.App.1996) ("we do not look for overwhelming evidence of guilt" in Rule 81(b)(2) analysis).

**27.** *See Miles v. State*, 918 S.W.2d 511, 517 (Tex.Crim.App.1996) (overwhelming evidence of guilt is not predominant concern in harm analysis under Rule 81(b)(2) but evidence in record must be considered); *Coble v. State*, 871 S.W.2d 192, 206 (Tex.Crim.App.1993)

("overwhelming evidence of guilt is a variable to be calculated" in harm analysis under Rule 81(b)(2)), *cert. denied*, 513 U.S. 829, 115 S.Ct. 101, 130 L.Ed.2d 50 (1994).

**28.** *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex.Crim.App.2000).

**29.** 953 S.W.2d at 271–73.

**30.** *Id.* at 272.

**31.** 3 S.W.3d 547 (Tex.Crim.App.1999).

**32.** *Id.* at 568.

**33.** 32 S.W.3d at 867.

**34.** *Id.*

sion of a relevant piece of evidence ... conducting a meaningful harm analysis would necessarily require consideration of all evidence which was admitted at trial. In short, the lower court should examine the record as a whole when conducting a harm analysis." [35]

And in *Llamas v. State,* we directed appellate courts to consider "everything in the record including all the evidence admitted at trial" in conducting a harm analysis under Rule 44.2(b).[36] In that case, the error was the denial of a severance. We disagreed with the lower court's "determination that the record contained insufficient data to measure harm."[37] Instead, we said, that was "not a case where the error defies harm analysis; everything in the court reporter's record is data from which a court can analyze harm. To judge the likelihood that harm occurred, appellate courts must consider everything in the record including all the evidence admitted at trial, the closing arguments, and, in this case, the jurors' comments during voir dire."[38]

We hold once again that the evidence of the defendant's guilt is a factor to be considered in any thorough harm analysis. The Court of Appeals erred in concluding otherwise.

## IV. Application

■ Because there seems to be some confusion among the courts of appeals as to how to weigh the evidence of the defendant's guilt in a harm analysis,[39] we will proceed to analyze the harm ourselves in this case, rather than remanding this case to the Court of Appeals.

Although the Court of Appeals indicated that the sufficiency of the evidence was not part of a harm analysis, it nevertheless appeared to consider the weight of the evidence. But its consideration was incomplete, as the court omitted substantial pieces of evidence. The sole contested issue in the case was Motilla's intent. The Court of Appeals characterized the evidence on intent as "scant."[40] The court mentioned the fact that Fisk was killed by a single gunshot to the arm; that neither of the two eyewitnesses actually viewed the shooting; and that, although Fisk remained alive shortly after the initial gunshot, Motilla did not fire a second shot to ensure Fisk's death.

The Court of Appeals overlooked several key pieces of evidence of intent. First, Martinez testified that when Motilla and Flores approached their group, Motilla told them to get on the ground and Flores said, "get the guy with the trunk." After Flores's statement to "get" Fisk, Motilla shot Fisk. A rational jury could have concluded that Motilla and Flores had planned the encounter and that Motilla's decision to shoot Fisk was following through with the plan and therefore demonstrated Motilla's intent to kill. In addition, after shooting

**35.** *Id., quoting Johnson,* 967 S.W.2d at 417 (internal quotations and brackets omitted).

**36.** 12 S.W.3d at 471.

**37.** *Id.*

**38.** *Id.*

**39.** *Compare, e.g., Mendez v. State,* 56 S.W.3d 880, 893 (Tex.App.-Austin 2001, no pet.)(stating that, if record contains adequate evidence of guilt without erroneously admitted evidence, then error is harmless under Rule 44.2(a)); *Sanford,* 21 S.W.3d at 346 (finding evidence of guilt not overwhelming and therefore concluding erroneous admission of evidence was harmful under Rule 44.2(b)); *and Hall v. State,* 13 S.W.3d 115, 119 (Tex.App.-Fort Worth 2000, pet. ref'd & pet. dism'd) (finding evidence of guilt ample, then proceeding to other factors in harm analysis under Rule 44.2(b)).

**40.** *Motilla,* 38 S.W.3d at 827.

Fisk and running off, Motilla and Flores returned. When they returned, Motilla put his gun to both Martinez's and Osuna's heads and asked for the keys to the car. He also took Osuna's necklace. Motilla's willingness to use his gun to threaten two other people, immediately after shooting Fisk, is further evidence of his intent to kill. The Court of Appeals concluded from Motilla's actions that he was not interested in killing Fisk because he did not shoot him a second time to ensure his death. But Motilla's actions could reasonably be interpreted as seeing no need to shoot Fisk a second time because his death was obviously imminent and focusing instead on threatening the two other people at the scene.

Also, immediately before shooting Fisk, Motilla grabbed Martinez's arm and attempted to throw him to the ground. This gesture could have been interpreted by the jury as an effort to ensure that Martinez did not interfere with Motilla's plan to kill Fisk.

Next, while the Court of Appeals characterized the evidence as a single gunshot to Fisk, the evidence actually reflects that two or three shots were fired. Even if only one of those shots hit Fisk, and even if it hit him only in the arm, the decision to fire more than once is further evidence of Motilla's intent to kill.

Finally, the evidence supported the conclusion that Motilla's recorded statement to the police, in which he confessed to shooting the victim, evidences a complete lack of remorse on Motilla's part. Motilla answers the officers' questions reluctantly, largely monosyllabically, and almost inaudibly. Defense counsel attempted to portray Motilla's performance as an indication

of his drunkenness, but the jury could have concluded otherwise. Moreover, although Motilla responded "yes" when the officer asked if he was sorry, a rational trier of fact could conclude from listening to the audiotape that Motilla was demonstrating contempt, defiance, and apathy during the interview rather than remorse. Motilla's attitude on the recording could have been considered by the jury as evidence that he did not regret killing Fisk and, indeed, that he had intended to do so. In conducting a complete review of the evidence admitted at trial, we find the evidence far from "scant." Though perhaps not overwhelming, the evidence of Motilla's intent to kill Fisk was substantial.

Another relevant factor in a harm analysis is "the character of the alleged error and how it might be considered in connection with other evidence in the case."[41] The appellate court did not address this issue, but aside from the substantial evidence of Motilla's guilt, this factor is perhaps the most important one in this case. The testimony of Fisk's mother was brief and bore no relationship to the sole contested issue in the case, Motilla's intent. While the testimony was irrelevant and somewhat emotional, it was not so "emotionally charged"[42] as to prevent the jury from rationally considering the evidence before it. As the dissent below pointed out, "the tenor of the erroneously admitted evidence here is neither inflammatory nor misleading or confusing."[43] In short, the testimony was innocuous.

Finally, we note that the State did not emphasize the error. In closing arguments, the prosecutor did not even mention the testimony of Fisk's mother.

**41.** *Morales,* 32 S.W.3d at 867.

**42.** *Compare Reese v. State,* 33 S.W.3d 238, 244 (Tex.Crim.App.2000).

**43.** *Motilla,* 38 S.W.3d at 830 (Anderson, J., dissenting).

## V. Conclusion

The Court of Appeals erred in dismissing the weight of the evidence in conducting its harm analysis. Though not dispositive, the evidence of the defendant's guilt is a relevant factor in conducting a harm analysis under Rule 44.2(b). And, once that evidence is fully considered, along with the other relevant factors, we must conclude that the error in this case was harmless. We have more than a fair assurance that the error did not influence the jury or had just a slight effect. We therefore reverse the Court of Appeals' judgment and affirm the judgment of the trial court.

MEYERS, J., did not participate.

JOHNSON, J., joined Parts I–III and Part V, and concurred in the result with respect to Part IV.