**AFFIRMED and Opinion Filed December 14, 2020**



In The

# Court of Appeals
## Fifth District of Texas at Dallas

### No. 05-19-00847-CR

**WESLEY MON MATHEWS, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 282nd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F-1745865-S**

## MEMORANDUM OPINION

Before Justices Molberg, Carlyle, and Browning
Opinion by Justice Browning

Appellant Wesley Mon Mathews pleaded guilty to causing the death of his adopted daughter, S.M., by injury by omission for failing to seek medical care.[1]  A jury sentenced him to life in prison.  In four issues, he challenges the admission of certain evidence.  In his remaining two issues, he argues that his life sentence violates the Eighth Amendment and that the trial court denied his common law right to allocution.  We affirm the trial court's judgment.

---

[1] The indictment alleged that appellant intentionally and knowingly, by omission, caused serious bodily injury to S.M. by failing to seek adequate medical attention for S.M. and that he had a statutory and legal duty to act on her behalf because he was her father and had assumed care, custody, and control of her.

## Background

Because appellant has not challenged the sufficiency of the evidence, we provide a brief recitation of the facts and elaborate as necessary in each individual issue. *See* TEX. R. APP. P. 47.1.

Appellant's and Mother's biological daughter was born in December of 2013. S.M. was born July 14, 2014 in India. Appellant and Mother adopted S.M. in July of 2016.

After S.M. arrived in the United States, a team of doctors at Children's Health Hospital evaluated her. They recommended physical and occupational therapy for various developmental delays. Although S.M. sometimes struggled with eating and drinking enough, she gained weight and flourished during her time in therapy.

On October 7, 2017, appellant noticed S.M. tossing in her crib, which was unusual because she typically fell asleep quickly.[2] Appellant asked S.M. if she was hungry because she had not finished her milk from earlier in the evening. She nodded her head.

Appellant's version of what transpired next changed over the following two weeks as he talked to police investigators. In his first interview, appellant told officers that S.M. refused to drink her milk. To discipline her, he made her stand in the garage, then in the alley behind their house, and finally by a tree near the

---

[2] S.M.'s crib was beside her parents' bed.

property. Each time he moved her, appellant left her alone for awhile before checking on her. When he returned to the tree in the early morning hours, S.M. was gone. He eventually called the Richardson Police Department's non-emergency number around 8 a.m. and reported S.M. missing. He later told officers that he waited to call because he did not want police activity to disturb the neighbors, and he wanted to avoid CPS involvement.[3]

The police department and the FBI conducted an extensive search for S.M. with hundreds of people and specially trained canines for approximately two weeks. On October 22, 2017, fifteen days after the search began, S.M.'s badly decomposed body was discovered in a culvert near the home. Dental records confirmed her identity.

When detectives interviewed appellant again, he changed his story. He said that he got frustrated in the garage and told S.M. to "[h]urry up and finish your milk" much louder than he meant to and "startled" her. She started crying and swallowing her milk at the same time, which caused her to choke.

When he realized that S.M. died, he was "too shocked by what happened" to scream for Mother or to call the police. He drove around looking for a place to put S.M.'s body and saw a culvert. He left her there and returned home.

---

[3] CPS previously conducted an investigation after a doctor reported concerns about abuse. Appellant and Mother were cleared of any wrongdoing.

Appellant admitted that S.M. died in his presence and that he regretted his actions on the night she died. Because the medical examiner could not determine a cause of death given her severely decomposed body, the State charged appellant with intentionally and knowingly, by omission, causing serious bodily injury to S.M. by failing to seek adequate medical attention. He pleaded guilty and after the punishment trial, the jury sentenced him to life in prison. This appeal followed.

## Admission of Evidence

In his first four issues, appellant challenges the trial court's admission of three different categories of evidence: (1) Dr. Suzanne Dakil's feelings about S.M.'s death; (2) irrelevant photographs of S.M.'s dead body because any probative value was outweighed by the risk of unfair prejudice; and (3) the admission of extraneous bad acts.

An appellate court reviews a trial court's ruling on the admission of evidence for an abuse of discretion. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019). The trial court abuses its discretion when it acts without reference to any guiding rules and principles or acts arbitrarily or unreasonably. *Id*.

### A. Dr. Dakil's Testimony

In his first issue, appellant argues the trial court abused its discretion by allowing Dr. Dakil, a child abuse pediatrician at UT Southwestern who treated S.M. for prior shoulder injuries, to testify that she felt angry when she heard about S.M.'s death. The State first responds that appellant did not object to similar testimony

from an FBI agent; therefore, his issue is waived. The State alternatively argues that the trial court acted within its discretion, or regardless, error, if any, was harmless.

Dr. Dakil testified about treating S.M. and her belief that S.M. was likely intentionally injured. Over appellant's relevance objection, Dr. Dakil testified that she felt angry when she heard about S.M.'s death on the news.[4]

To the extent the State contends that appellant waived his argument by not objecting to an FBI agent's testimony about also feeling angry, we reject the invitation to find waiver. Generally, a trial court does not err by admitting evidence when the same evidence comes in without objection. *See Lane v. State*, 151 S.W.3d 188, 193 (Tex. Crim. App. 2004).

While we agree the FBI agent and Dr. Dakil both testified that they felt angry, the basis for their testimony is different. The FBI agent agreed that anger would be a "fair emotion" any time a child dies and the FBI's office unnecessarily spends hundreds of hours and resources searching for a child that, as in this case, appellant knew was dead. Thus, the FBI agent's anger stemmed from what could be perceived as a waste of resources and manpower when appellant knew S.M. was dead in a culvert. In contrast, the State argued that Dr. Dakil's feelings were relevant as S.M.'s treating physician, as the one who called CPS, and as the one who "did everything she could to show that she was extremely concerned for this child." Dr. Dakil's

---

[4] The State asked, "How did it make you feel?" after she saw that S.M. was missing on the news.

–5–

feelings of anger manifested from her personal interaction with and care for S.M. Given the witnesses' different experiences and reasons for their anger, we cannot say that appellant waived his argument regarding Dr. Dakil because he did not object to the FBI agent's testimony.

Assuming, without deciding, that the admission of Dr. Dakil's opinion testimony constitutes error, the error did not harm appellant. The erroneous admission of evidence generally constitutes nonconstitutional error. *See Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). We must disregard a nonconstitutional error if it does not affect substantial rights. TEX. R. APP. P. 44.2(b). "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *Schmutz v. State*, 440 S.W.3d 29, 39 (Tex. Crim. App. 2014). Substantial rights are not affected by the erroneous admission of evidence "if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect." *Motilla*, 78 S.W.3d at 355.

In assessing the likelihood that the jury's decision was adversely affected by the error, we must "consider everything in the record," including the defendant's guilt. *Id.* Appellant pleaded guilty to the offense; therefore, the proceedings became a unitary trial dedicated solely to determining what punishment he should receive. *See Carroll v. State*, 975 S.W.2d 630, 631–32 (Tex. Crim. App. 1998); *see also*

*Jeffries v. State*, No. 05-11-00069-CR, 2012 WL 3517314, at *2 (Tex. App.—Dallas Aug. 16, 2012, no pet.) (mem. op., not designated for publication).

Here, the jury heard evidence that S.M. was adopted and treated differently from their biological daughter. Many pictures of their biological daughter, but not S.M., were visible around the home. Appellant repeatedly referred to S.M. as "the girl" when interviewed by officers, but called his biological daughter by name. Text messages between appellant and Mother indicated that appellant felt they adopted a child with "defects."

S.M. struggled with feeding issues and despite doctors and therapists educating them to never force feed, appellant admitted to punishing S.M. for not drinking her milk on the night she died. He first told officers that he made S.M. stand in "her spot" in the kitchen to drink her milk, but when she continued to dawdle, he took her to the garage. He left her in the garage for awhile, but later moved her outside the fence and eventually to a tree within view of the house when she continued to refuse her milk. Appellant wanted to scare her by leaving her in the dark where he had seen coyotes weeks earlier.

Police video from the day S.M. disappeared showed appellant following officers around his house instead of helping. He expressed little emotion for his missing child whom he knew was already dead in a culvert.

Jurors heard about the hours of manpower and numbers of people involved in the two-week search while appellant continued to conceal S.M.'s whereabouts.

Once cadaver dogs found S.M.'s body, officers interviewed appellant again and he changed his story. He claimed S.M. died after choking on her milk, but doctors testified that was unlikely. Appellant testified he performed CPR but in hindsight, he should have woken up Mother, who was a nurse.

When he realized S.M. was dead, he put her body in a recycling bag and placed her in the cargo space of his SUV with trash. He turned off the Location Services settings on his and Mother's phones before leaving, but a neighborhood security camera captured his SUV leaving the garage at 4:19 a.m. He then drove around looking for a place to leave her body. He dumped the trash in a nearby dumpster and then saw the culvert, which was within view of his home's alley. He shoved S.M.'s body into the culvert as far as he could and left. The security camera captured his car returning home at 4:53 a.m.

Around 8 a.m., appellant finally called the Richardson Police Department's non-emergency number to report his missing child. He told officers he did not call earlier because he did not want police activity to bother the neighbors.

When S.M.'s body was finally discovered, it was badly decomposed and most of her internal organs were gone. Her skeletal bones were positively identified by dental records. By lying to officers and delaying the discovery of S.M.'s body, appellant prevented medical examiners from determining her cause of death.

Appellant admitted that he "made mistakes" the night S.M. died and wished that he had acted differently. Church friends and family members testified that

–8–

appellant had no criminal record, was a good father, and had never acted violently towards the children. In contrast, Mother told officers that appellant was the disciplinarian in the home, and he hit S.M. the night of her death because he was frustrated that she would not drink her milk. We note that the State mentioned Dr. Dakil's statement in its closing argument at the punishment trial, but this does not change our analysis.

After examining the record as a whole, we have fair assurance that the brief mention and single repetition of Dr. Dakil's statement did not influence the jury's punishment, or had but a slight effect. *See Motilla*, 78 S.W.3d at 355. We overrule appellant's first issue.

### B. Photographs of S.M.'s Dead Body

In his second and third issues, appellant argues that the trial court abused its discretion by admitting irrelevant photographs over his rule 403 objection. The State responds that the court acted within its discretion because the photographs were relevant, and the danger of any unfair prejudice was not outweighed by their probative value.

During a pretrial hearing, appellant objected to seven "gruesome" photographs (exhibits 45-48 and 80-82) from the discovery of S.M.'s body and from her autopsy. He argued that the pictures were irrelevant for punishment and that the prejudicial nature would only inflame the jury. He was "afraid that can be something that a jury cannot come back from" if they saw them.

The State responded that exhibit 46 was relevant because it showed the position of S.M.'s body, which appellant described to police and corroborated his story. It argued exhibits 47 and 48 were relevant to establish aggravating circumstances, specifically, that the medical examiner could not determine the cause of S.M.'s death because of how long she was in the culvert (a situation caused by appellant concealing her whereabouts for twelve days).

The State contended that exhibits 80 (the autopsy identification photo with only the skull), 81 (skeletal body on the autopsy table), and 82 (chest and ribcage showing no internal organs for examination) were relevant to explain why S.M.'s cause of death was unknown and to provide an overall picture of the nature of the case.

The State explained it did not intend to flaunt the pictures around the courtroom, but instead planned to "discreetly" show them to the jury. The State offered numerous, additional photographs for record purposes supporting its argument that it picked the least gruesome photographs to show the jury rather than those that would inflame the jury.

At the conclusion of the pretrial hearing, the court sustained appellant's objections to exhibits 45, 47, and 80. After finding exhibits 46, 48, 81, and 82 relevant and conducting a rule 403 balancing test, the trial court overruled appellant's objections.

During trial, appellant reurged his objections when the State offered the pictures. The court again overruled the objections.

Generally, a trial court does not abuse its discretion by admitting photographs if verbal testimony as to matters depicted in the photographs is also admissible. *Gallo v. State*, 239 S.W.3d 758, 762 (Tex. Crim. App. 2007). Texas Rule of Evidence 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would without the evidence." TEX. R. EVID. 401. During punishment, a trial court is authorized to admit any evidence to any matter it deems relevant to sentencing, which includes the circumstances of the offense. *See* TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(a)(1). Determining what is relevant "should be a question of what is helpful to the jury in determining the appropriate sentence in a particular case." *See Mendiola v. State*, 21 S.W.3d 282, 285 (Tex. Crim. App. 2000) (quoting *Rogers v. State*, 991 S.W.2d 263, 285 (Tex. Crim. App. 1999)).

Rule 403, on the other hand, allows for the exclusion of otherwise relevant evidence when its probative value "is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." TEX. R. EVID. 403. A reviewing court considers several factors in determining whether the probative value of photographs is substantially outweighed by the danger of unfair

prejudice. *Gallo*, 239 S.W.3d at 762. These factors include, but are not limited to, the number of exhibits offered, their gruesomeness, their detail, their size, whether they are black and white or color, whether they are close-up, and whether the body depicted is naked or clothed. *Id.*

In this case, the pictures at issue were gruesome, but they were probative to show the nature of the crime, corroborate appellant's story, and explain why the medical examiner could not determine the cause of death. Appellant acknowledged in the hearing outside the jury's presence that the State could discuss the pictures and "put on testimony to that extent." Thus, defense counsel conceded the pictures were relevant. *Id.* (no abuse of discretion by admitting photos if verbal testimony as to matters depicted in photographs is also admissible).

The court admitted only four photographs of the hundreds taken in the case. We cannot tell from the record whether the photographs shown to the jury were color or black and white; the copies in our record are black and white. Regardless, while the photographs are gruesome, they are not unnecessarily so. *See Shuffield v. State*, 189 S.W.3d 782, 787 (Tex. Crim. App. 2006).

Special Agent Strain testified that she spent a lot of time with prosecutors sorting through hundreds of photographs deciding which ones to show the jury. Although the photographs showed S.M.'s decomposed body and certainly left an impression with viewers, the photographs showed nothing more than the reality of the crime. *See, e.g., Valdez v. State*, No. 05-18-00917-CR, 2020 WL 242530, at *7

–12–

(Tex. App.—Dallas Jan. 16, 2020, pet. ref'd) (mem. op., not designated for publication) (noting prosecutor and detective examined and limited number of photos shown of decomposing body); *see also Chamberlain v. State*, 998 S.W.2d 230, 237 (Tex. Crim. App. 1999) (stating gruesome photos depicting disagreeable realities of crime are "powerful visual evidence, probative of various aspects of the State's case" and therefore admissible).  The photographs were not inadmissible simply because they caused juror reactions.[5]  Rather, to be inadmissible, they must be offered for the sole purpose of inflaming the minds and passions of the jury.  *See Potter v. State*, 74 S.W.3d 105, 113 (Tex. App.—Waco 2002, no pet.).  Such was not the case here.

Accordingly, the trial court did not abuse its discretion by admitting the photographs.  Appellant's second and third issues are overruled.

*C. Admission of Extraneous Bad Acts*

In his fourth issue, appellant contends the trial court committed reversible error by admitting extraneous bad acts that the State did not prove beyond a reasonable doubt.  The State responds the trial court acted within its discretion, or alternatively, that error, if any, was harmless.

We review a trial court's decision to admit an extraneous offense during the punishment phase under an abuse of discretion standard.  *Mitchell v. State*, 931

---

[5] Defense counsel noted on the record, without objection, that some jurors cried when they saw the photographs.

S.W.2d 950, 953 (Tex. Crim. App. 1996). During the punishment phase, the State may offer evidence as to any matter the court deems relevant to sentencing, including evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt to have been committed by the defendant or for which he could be held criminally responsible. TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(a)(1). When presented with an appropriate objection, the trial court has the responsibility to determine the threshold issue of whether an extraneous offense is relevant. *See Mitchell*, 931 S.W.2d at 953–54; *Arzaga v. State*, 86 S.W.3d 767, 781 (Tex. App.—El Paso 2002, no pet.). Then the jury, as the exclusive judge of the facts, determines whether or not the State proved the extraneous offenses beyond a reasonable doubt and should be so instructed when requested. *Mitchell*, 931 S.W.2d at 954; *Arzaga*, 86 S.W.3d at 781.

The trial court satisfies its responsibility by making an initial determination that a jury could reasonably find beyond a reasonable doubt that the defendant committed the extraneous offenses. *Arzaga*, 86 S.W.3d at 781. This threshold determination is not a finding by the court that the State has proved an extraneous bad act beyond a reasonable doubt, but is instead a finding that sufficient evidence exists from which a jury could reasonably find so. *Id.*

In total, the State wanted to present evidence of five fractures that occurred in a five-month period that did not align with the parents' explanation of how S.M. received them: (1) a broken arm allegedly caused from falling off the couch in

September 2016; (2) a hospital visit in February 2017 for two bilateral fractures in both shoulders; and (3) unreported femur and tibia fractures of unknown origin, consistent with abuse, that likely happened one to three months prior to February 2017.

In a pretrial hearing, the State argued Dr. Dakil would testify to the following:

- The shoulder injuries were not consistent with the parents' story, but rather consistent with yanking or twisting of both arms simultaneously, which could pull the bone away from the growth plate.

- The injuries likely occurred at least a week before they brought S.M. to the hospital.

- The femur and tibia fractures occurred sometime between November and January of 2017, but S.M.'s medical records did not indicate that she received any treatment for the injuries.

- Although she could not determine with specificity if the femur break occurred from abuse, the fracture would cause significant pain and a caretaker should have noticed it.

Appellant and Mother were S.M.'s sole caretakers during the time of these injuries. Importantly, S.M. did not suffer any additional fractures once Children's Hospital got involved in her care in February 2017.

The State presented a text message exchange between Mother and appellant when Mother took S.M. to the hospital for her shoulder injuries. Mother texted,

"This makes sense why her bones break," and appellant responded, "Oh, yeah." At the time of this exchange, the femur and tibia fractures had not been discovered. Thus, the text exchange indicated that they knew of previous injuries.

Appellant argued in response that S.M.'s therapists, who interacted with her during the relevant time frame, never noticed any injuries, which they would have documented in her medical records. "So the potential that she, uh, received injuries at the hands of another is out there." Appellant asserted that the State was speculating that he injured S.M., which would be unduly prejudicial and cause great harm during punishment.

The trial court took the issue under advisement. At a subsequent hearing, the court, after conducting a balancing test, reviewing the record, and considering counsels' arguments, overruled appellant's objections and allowed the State to present the extraneous offense evidence.

The State's arguments during the pretrial hearing as to how it intended to prove the injuries through Dr. Dakil's testimony and the text message exchange between S.M.'s parents were sufficient for the trial court to make an initial determination of relevance. *See, e.g., Arzaga*, 86 S.W.3d at 781–82. Accordingly, the trial court did not abuse its discretion by determining sufficient evidence existed from which the jury could find beyond a reasonable doubt that appellant previously injured S.M. *See, e.g., Villalba v. State*, No. 05-13-01661-CR, 2015 WL 1514453, at *7–8 (Tex. App.—Dallas Mar. 31, 2015, pet. ref'd) (mem. op., not designated for

publication) (concluding trial court did not abuse discretion by admitting relevant extraneous offense despite officer admitting he found no direct evidence linking gun to defendant because other evidence supported conclusion).

Once the trial court found sufficient evidence, the jury then, as the exclusive judge of the facts, determined whether the State proved the extraneous offenses beyond a reasonable doubt. *Mitchell*, 931 S.W.2d at 954. Dr. Dakil testified that S.M.'s shoulder injuries were not from "normal childhood play." She described the full skeletal survey conducted and the discovery of multiple, past bone fractures. After ruling out vitamin deficiency, genetic abnormalities, and other conditions that could cause bone problems, Dr. Dakil believed S.M. was the victim of intentional injuries. When Dr. Dakil asked appellant and Mother about the other fractures, neither provided an explanation other than the injuries happened pre-adoption. Based on Dr. Dakil's and her medical team's review of S.M.'s complete medical history when she arrived in the United States, S.M.'s injuries did not occur in India before her adoption. She testified most fractures heal within three to six months, and S.M. had been in the U.S. for seven months when they were discovered.

The State introduced the text exchange between appellant and Mother indicating they knew of other unreported bone fractures. Appellant also told Mother during the exchange that he wondered "if they will find any more defects" and that he did not want doctors to run any more tests on S.M. because "we'll end up paying."

–17–

On cross-examination, Dr. Dakil conceded that she could only give rough generalizations of when and how the previous fractures occurred. However, the femur fracture would cause symptoms that a parent should notice; the tibia fracture could be harder to notice.

The jury heard evidence from both sides concerning S.M.'s past injuries. The trial court properly instructed the jury in its written punishment charge that it was not to consider the testimony of other acts "unless you first find and believe beyond a reasonable doubt that the defendant committed such other acts or participated in such transactions," but if it did not believe or had a reasonable doubt, "you will not consider such testimony for any purposes." The jury is presumed to have followed the court's charge. *See Silva v. State*, No. 09-12-00302-CR, 2014 WL 2611150, at *7 (Tex. App.—Beaumont June 11, 2014, no pet.) (mem. op., not designated for publication). Accordingly, appellant has failed to show reversible error.

Even if we concluded that the trial court erred, which we do not, error, if any, was harmless for the reasons previously discussed in section *A*. The extraneous offense evidence did not taint the jury's otherwise objective assessment of the other evidence surrounding S.M.'s tragic death because of appellant's omissions. *See Motilla*, 78 S.W.3d at 355 ("Substantial rights are not affected by the erroneous admission of evidence 'if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect.'"). Appellant's fourth issue is overruled.

**Cruel and Unusual Punishment**

Appellant argues in his fifth issue that his life sentence is grossly disproportionate and constitutes cruel and unusual punishment under the Eighth Amendment. The State responds that his sentence falls within the statutory-prescribed range and is not unconstitutionally disproportionate to be cruel and unusual.

Texas courts have traditionally held that as long as punishment is within the range established by the legislature, the punishment assessed does not violate the federal prohibitions against cruel and/or unusual punishment. *See Samuel v. State*, 477 S.W.2d 611, 614 (Tex. Crim. App. 1972). Here, appellant pleaded guilty to the offense and his life sentence falls within the statutory range, and therefore, cannot generally be considered cruel and unusual. *See Grigsby v. State*, No. 05-19-00738-CR, 2020 WL 2847289, at *2 (Tex. App.—Dallas June 2, 2020, pet. ref'd) (mem. op., not designated for publication); *see also* TEX. PENAL CODE ANN. §§ 12.32(a), 22.04(e).

However, a very narrow exception exists that an individual's sentence may constitute cruel and unusual punishment, despite falling in the statutory range, if it is grossly disproportionate to the offense. *See Kim v. State*, 283 S.W.3d 473, 475 (Tex. App.—Fort Worth 2009, pet. ref'd) ("Subject only to a very limited, 'exceedingly rare,' and somewhat amorphous Eighth Amendment gross-disproportionality review, a punishment that falls within the legislatively prescribed

range, and that is based upon the sentencer's informed normative judgment, is unassailable on appeal."). To evaluate the proportionality of a sentence, the court first makes a threshold comparison of the gravity of the offense against the severity of the sentence. *Grisgby*, 2020 WL 2847289, at \*2. When we analyze the gravity of the offense, we examine the harm caused or threatened to the victim, the culpability of the offender, and the offender's prior adjudicated and unadjudicated offenses. *See State v. Simpson*, 488 S.W.3d 318, 323 (Tex. Crim. App. 2016). Only if gross disproportionality is found do we then compare the sentence to sentences received for similar crimes in this and other jurisdictions. *Id*.

Appellant emphasizes that he has no prior criminal history. He also highlights that the State presented no evidence he intended to kill S.M., but instead witnesses testified that he had been a loving, committed father who provided for his family.

The jury, however, considered appellant's multiple inconsistent stories to police and his actions on the night S.M. died. These included not waking Mother, a nurse, to help, turning off the Location Services settings on the phones, putting S.M. in a bag and loading her in the car trunk with trash, coming back home and doing his laundry so that Mother did not notice his dirty clothes, waiting hours to report S.M. missing, and calling the non-emergency number instead of 911.

Appellant indicated he was disappointed that they adopted a child with "defects." In one interview, he stated, "If she had just finished her milk it would

look good on everyone." Ultimately, S.M.'s cause of death could not be determined because of appellant's actions.

Appellant's life sentence falls within the applicable statutory range. *See* TEX. PENAL CODE ANN. §§12.32(a), 22.04. This is not one of the "exceedingly rare" cases that leads to an inference that appellant's sentence was grossly disproportionate to the offense. *See Kim*, 283 S.W.3d at 475. Appellant testified that if the jury "wants to give me" a life sentence, "I'm more than happy to take it." This is what the jury did. Appellant's fifth issue is overruled.

## Common Law Right to Allocution

In his final issue, appellant claims that the trial court violated his common law right to allocution. Appellant acknowledges that the trial court complied with article 42.07 of the code of criminal procedure, but argues the statutory version differs significantly from the common law right.

Appellant did not complain about a common law allocution right during sentencing, nor did he object when the court pronounced his sentence. An appellate complaint about denial of the right of allocution, whether statutory or one claimed under the common law, requires a timely trial objection. *See Zamarron v. State*, No. 05-19-00632-CR, 2020 WL 6280869, at *4 (Tex. App.—Dallas Oct. 27, 2020, no pet.) (mem. op., not designated for publication); *Winters v. State*, No. 05-19-00696-CR, 2020 WL 5036148, at *7 (Tex. App.—Dallas July 2, 2020, pet. ref'd) (mem. op., not designated for publication); *Gallegos-Perez v. State*, No. 05-16-00015-CR,

2016 WL 6519113, at *2 (Tex. App.—Dallas Nov. 1, 2016, no pet.) (mem. op., not designated for publication). Appellant did not timely object. Accordingly, we overrule his final issue.

## Conclusion

Having overruled appellant's issues, we affirm the trial court's judgment.

/John G. Browning/
JOHN G. BROWNING
JUSTICE

Do Not Publish
Tex. R. App. P. 47.2(b).
190847F.U05



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

WESLEY MON MATHEWS,
Appellant

No. 05-19-00847-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 282nd Judicial
District Court, Dallas County, Texas
Trial Court Cause No. F-1745865-S.
Opinion delivered by Justice
Browning. Justices Molberg and
Carlyle participating.

Based on the Court's opinion of this date, the judgment of the trial court is
**AFFIRMED**.

Judgment entered December 14, 2020