

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

---

No. 07-23-00131-CR

---

MARIAN FRASER, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

---

On Appeal from the 19th District Court
McLennan County, Texas
Trial Court No. 2014-158-C, Honorable David Hodges, Presiding[1]

May 6, 2026

## MEMORANDUM OPINION ON REMAND

Before PARKER, C.J., and DOSS and YARBROUGH, JJ.

For the fourth time this Court is tasked with reviewing the felony murder conviction of Appellant, Marian Fraser.[2] She was accused of administering a fatal amount of

---

[1] This cause was originally filed in the Tenth Court of Appeals and was transferred to this Court by a docket-equalization order of the Supreme Court of Texas. *See* TEX. GOV'T CODE § 73.001. In the event of any conflict, we apply the transferor court's case law. TEX. R. APP. P. 41.3.

[2] *Fraser v. State*, 523 S.W.3d 320 (Tex. App.—Amarillo 2017) (*Fraser I*), *rev'd*, 583 S.W.3d 564 (Tex. Crim. App. 2019); *Fraser v. State*, 593 S.W.3d 883 (Tex. App.—Amarillo 2019, pet. ref'd) (*Fraser II*) (remanding for new trial); *Fraser v. State*, No. 07-23-00131-CR, 2024 Tex. App. LEXIS 7068 (Tex. App.—Amarillo Oct. 1, 2024), *rev'd in part*, 726 S.W.3d 253 (Tex. Crim. App. 2025) (*Fraser III*).

diphenhydramine (Benadryl) to C.F. while the infant was in her care. In our most recent opinion, we affirmed Appellant's conviction and sentence of 50 years. The Court of Criminal Appeals disagreed with our resolution of Appellant's suppression issue[3] and our conclusion she had not completed the procedure for preserving her complaint on the admission of extraneous offense evidence. The Court reversed in part and remanded the case for consideration of (1) whether Appellant suffered constitutional harm under Rule 44.2(a) of the Texas Rules of Appellate Procedure by the trial court's denial of her motion to suppress and (2) the merits of her extraneous-offense objections, if necessary.[4]

This Court requested supplemental briefing from both parties. Appellant presents a single issue asserting she suffered harm requiring reversal of her conviction due to the following erroneously admitted evidence:

- text messages between her and her daughter;

- text messages between her and another parent whose child attended daycare;

- screenshots of text messages between her and C.F.'s mother which were erased from the computer; and

- an image of C.F.'s autopsy report that was erased from the computer.

Appellant posits the jury's request during deliberations to review illegally seized text messages between her and her daughter leaves no doubt the jury considered them to

---

[3] The Court held the probable cause affidavit for the warrant to seize Appellant's electronic devices and the probable cause affidavit for the warrant to search those devices both lacked a sufficient nexus between the offense and seized devices. *Fraser*, 726 S.W.3d at 257, 270–72. The Court concluded this Court erred in holding the trial court did not abuse its discretion in denying Appellant's pretrial motion to suppress. *Id.* at 272.

[4] *See Fraser*, 726 S.W.3d at 257. Our disposition on the suppression issue renders a discussion of the issue on extraneous offense evidence unnecessary. TEX. R. APP. P. 47.1.

her detriment.  Thus, she concludes it is not possible to determine beyond a reasonable doubt that the evidence did not contribute to her conviction or punishment.  We reverse and remand.

## BACKGROUND

Appellant operated a State licensed daycare center out of her home in Waco, Texas.  C.F. began staying at her daycare on January 2, 2013.  In late January, she was sleeping a lot and developed a cough around mid-February.  Later in February, she had a fever which her mother attributed to routine immunizations.

On March 4, 2013, Appellant and Sherri Adams were working at the daycare.  C.F. arrived at the daycare at approximately 7:45 a.m.  She generally brought her own bottle because she would not finish it at home, and it was usually given to her between 8:15 and 8:30 a.m.  Between 11:15 and 11:30 a.m., Appellant gave C.F. a bottle.  She was solely responsible for preparing the children's bottles.

C.F. generally slept in a baby swing during naptime but on that day, Appellant placed her in a bed because she was becoming mobile.  As required by State licensing standards, she placed C.F. on her back.  She checked on the children every fifteen minutes or so.

Around 2:30 p.m. on March 4, Appellant received a phone call from a parent who wanted to pick up her child early.  That child slept in the bed next to C.F.  When Appellant went to get the child, she noticed that C.F. had rolled over and thrown up.  She was unresponsive and not breathing and Appellant began compressions and CPR.  She

3

instructed Adams to call 911. When EMTs arrived, they continued CPR and took C.F. to the hospital. Appellant rode in the ambulance with C.F., and C.F.'s mother was contacted.

C.F. was pronounced dead approximately an hour after arriving at the hospital. Her body was sent to a forensic institute in Dallas for an autopsy. A toxicology report revealed she had a high level of diphenhydramine in her system when she died.

The Childcare Licensing Department of the Texas Department of Family and Protective Services received an intake regarding C.F.'s death on the night of her death. An investigation was immediately opened. The administrator for daycare investigations went to Appellant's home that evening. The next day, the case was assigned to a childcare investigator. She interviewed Appellant, Adams, C.F.'s parents, other parents, and a detective.

The investigator cited Appellant for, among other violations, physical abuse and neglect and not using good judgment. The State's investigation revealed that Appellant stored over-the-counter medications in a cabinet together with some prescription medications. One of the bottles labeled for allergy relief contained diphenhydramine. Also inside the cabinet was a pill crusher and scale for diphenhydramine prescribed by a veterinarian for Appellant's dog. Once State licensing completed its investigation, the matter was disposed of with a disposition of "reason to believe" the incident happened under Appellant's care. The daycare closed permanently in late May 2013, and Appellant was cited for physical abuse of C.F.

During an interview with a detective in May 2013, Appellant claimed she never administered diphenhydramine to C.F. But she soon became the primary suspect in

4

C.F.'s death. By her own admission, she was the only person who prepared C.F.'s bottles or administered any medications. She was eventually charged with felony murder.

At a pretrial hearing, Appellant moved to suppress all information seized from her electronic devices. The devices included Appellant's iPhone 5, an iPad, a second iPhone, a Samsung phone belonging to Appellant's husband, and an HP computer tower. The trial court denied her motion and ruled that all information on the devices *after* C.F.'s death would be admissible.

Once all testimony and evidence was presented, the jury retired to deliberate at 12:34 p.m. At 1:41 p.m., the trial court announced it had received a note from the jury as follows:

> "[w]e want to see all the text messages between the daughter, Logan, and Marian."

Appellant's daughter, Logan, was a college student at the time. She drove home for Spring Break a few days after C.F.'s death.

In response to the jury's note, the trial court provided the jury with State's Exhibits 52, 53, 54, and 55.[5] The jury returned with a guilty verdict at 3:02 p.m.

C.F. passed away on March 4, 2013. On March 8, Logan and Appellant exchanged the following messages:

> Logan: The licensing lady was in the driveway when I got home.
>
> Appellant: What did u tell her[?]
>
> Logan: She's going to sit out and wait.

---

[5] During trial, the exhibits were enlarged on posters and displayed to the jury.

Appellant: Oh that's crazy.

Logan: Yeah . . . in her car.

Appellant: So she's sitting outside[.]  Ok.  Do me a favor and the kids [sic] medicine that is in the cabinet in the daycare room go put it in ur closet[.] Thanks.  Just in case she looks[.]  Call me[.]

On March 25, the two exchanged the following messages:

Logan: It's only Monday and I need a drink lol[.]

Appellant: I agree I quit during nap[.]

Logan: Quit what? Lol[.]

Appellant: Daycare[.]

Logan: Sitting in there doesn't help either!  No don't do that lol!  What happened?

Appellant: No one napped[.]  Sitting in there is why they don't nap!!

Logan: And you have to be in there?

Appellant: Well no one will know[.]

Logan: Exactly[.]  The babies won't tell lol[.]

Appellant: Very true.  I [sic] going to keep [T] with me and then just check on the rest.

Appellant maintains the trial court's denial of her motion to suppress caused her harm of constitutional magnitude.  We agree.[6]

---

[6] Relying on *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998), the State argues reversal is not required because other unobjected-to evidence of the same sought to be suppressed was received without objection.  We disagree.  When, as in the underlying case, a trial court denies a motion to suppress, a defendant need not specifically object to the same evidence at trial to preserve the issue for review on appeal.  *Thomas v. State*, 408 S.W.3d 877, 881 (Tex. Crim. App. 2013).  This principle applies even if the defendant states "no objection" at trial unless the record shows an unambiguous intent to abandon the claim of error that was previously preserved by an adverse ruling on a motion to suppress.  *Id.* at 884.  The record here does not show a clear intent by Appellant to abandon her earlier preserved claims.

**HARM ANALYSIS ON ERRONEOUS DENIAL OF MOTION TO SUPPRESS**

An erroneous denial of a motion to suppress is reviewed under the constitutional standard of Rule 44.2(a) of the Texas Rules of Appellate Procedure. *Fraser*, 726 S.W.3d at 273 (citing *Hernandez v. State*, 603 S.W.3d 106, 108 (Tex. Crim. App. 2001)). The standard requires an appellate court to reverse a judgment of conviction or punishment unless it determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment. TEX. R. APP. P. 44.2(a). Such an analysis focuses on "the likelihood that the constitutional error was actually a contributing factor in the jury's deliberations in arriving at that verdict." *Wells v. State*, 611 S.W.3d 396, 410 (Tex. Crim. App. 2020). In other words, was there a reasonable possibility the error was a contributing factor? *Id.* The State, as the beneficiary of the error, has the burden of proving the error did not contribute to the defendant's conviction or punishment beyond a reasonable doubt. *Williams v. State*, 958 S.W.2d 186, 194 n.9 (Tex. Crim. App. 1997).

An appellate court evaluates the entire record in a neutral manner and not in the light most favorable to the prosecution. *Wells*, 611 S.W.3d at 410–11. Non-exhaustive factors for review include the nature of the error, whether the State emphasized error, and the weight the jury likely assigned to the error in the course of its deliberations. *Childers v. State*, 719 S.W.3d 705, 707 (Tex. Crim. App. 2025); *Snowden v. State*, 353 S.W.3d 815, 822 (Tex. Crim. App. 2011). Overwhelming evidence supporting the jury's verdict can also be a factor in a harmless error review. *Motilla v. State*, 78 S.W.3d 352, 357 (Tex. Crim. App. 2002).[7]

---

[7] The State relies heavily on *Motilla* and the overwhelming evidence of guilt. But *Motilla* indicates the weight of the evidence is not dispositive but only a relevant factor to consider. 78 S.W.3d at 360.

ANALYSIS

**Nature of the Error**

As determined by the Court of Criminal Appeals, the nature of the error was the trial court's erroneous admission of evidence from Appellant's electronic devices. The affidavits in support of the seizure and search of the devices were insufficient to provide the magistrate with probable cause to issue the warrants. *Fraser*, 726 S.W.3d at 270–72. The only nexus between the devices and the offense was the affiant's personal beliefs. The Court noted the affiant's mere affirmation of belief or suspicion without any factual basis was insufficient to sustain issuance of the warrants. *Id.* at 271. The Court dismissed the State's argument that a lengthy recitation of the case's factual background saved the warrants. *Id.* We conclude the nature of the error in admitting illegally seized evidence was serious.

**State's Emphasis of the Error**

During its opening statement, the State argued, "[e]veryone that takes this witness stand and every exhibit we present will point to [Appellant]." "And critically importantly, the actions she takes after the death - - because, you see, she speaks to people. Importantly, her daughter Logan, who will testify in this trial." Even before any evidence is presented, the State informs the jury that Appellant tells her daughter to move medications from a cabinet in the daycare room to her closet "in case [the licensing specialist] looks." The State also emphasized that even before C.F.'s cause of death was known, Appellant communicated to her daughter "[m]ake sure they don't find the medicine."

8

The illegally seized text messages were enlarged into posters by the State and displayed for the jury. The enlargements were admitted into evidence and intended to emphasize the communications between Appellant and others during the investigation into C.F.'s death. Evidence from Appellant's computer tower which had been deleted was also emphasized by the State as preparation of a defense and indicative of guilt.

Despite the text messages previously having been admitted, the State called Appellant's daughter to testify. The prosecutor acknowledged the daughter was placed in "a somewhat difficult position here testifying . . . ." She was questioned about the text exchanges with her mother from March 8 and March 25, 2013. The daughter admitted she moved the children's medicine from a cabinet to her closet per Appellant's request. Her testimony portrayed Appellant as wanting to hide evidence. The daughter's direct examination was cumulative of the text messages, and the State emphasized those messages as indicative of Appellant's guilt.

The State began its closing argument by telling the jury Appellant was in the "business of putting kids to sleep, and she was good at it because she used medication. She used medication in those bottles to put those kids to sleep." The State continued, "[Appellant] drugged those children to make her life easier because she was lazy." The jury was reminded they could take the text messages "back there and review all of them."

The argument continued by reminding the jury of Appellant's daughter's text message that the babies don't sleep while Appellant is in the room. The State claimed that Appellant texting her daughter to hide medications in case the State licensing specialist looked indicated Appellant was "start[ing] to build her defense . . . as any guilty person would do."

9

The State then emphasized text messages between Appellant and her daughter from March 25 regarding Appellant's presence while the babies napped. The daughter told her she did not need to be in the room because "the babies won't tell."

The jury was reminded that Appellant had saved text messages with C.F.'s mother related to Motrin but deleted other messages. The State again argued, Appellant is "building her defense as any guilty person would."

Messages between Appellant and another parent were recalled for the jury to remind them Appellant had told that parent not to mention medicine to the investigating detective—remember, "I don't give medicine."

After Appellant's closing argument, the State delivered its final closing argument. The State argued Appellant's motivation to drug children was her reputation in the community as a caregiver for babies. The text message between Appellant and another parent to not tell the detective about medications was mentioned again as being indicative of Appellant's "clearly guilty-conscience behavior."

During the State's final closing argument in the punishment phase, a text message between Appellant and C.F.'s mother after the death of the child was emphasized. C.F.'s mother texted she was "so lost. I'm so confused. I still don't know what happened." The State argued Appellant concealed the truth, asked her daughter to lie and hide evidence, and was sorry only because she got caught.

The voluminous record shows multiple instances in which the State emphasized the illegally seized evidence to the jury. The State heavily relied on evidence from Appellant's electronic devices from its opening arguments during guilt/innocence to

10

closing arguments in the punishment phase. We conclude the State placed great emphasis on the evidence from Appellant's electronic devices.

**Weight the Jury Likely Assigned**

Appellant's trial was based on circumstantial evidence. There was no determination as to when and where C.F. ingested a fatal dose of diphenhydramine. While there was expert testimony on the drug and that it caused C.F.'s death, neither her parents nor Appellant claimed to have administered diphenhydramine to her. The State targeted Appellant as a suspect early in the investigation and sought warrants to seize and search all her electronic devices. Once data was retrieved, the State made that data an important component of its prosecution. From opening statements, the State informed the jury the evidence from Appellant's electronic devices would be "critically" important. During closing arguments, the State reminded the jury they could take the text messages with them during deliberations.

Throughout trial which spanned several weeks, approximately 130 exhibits were admitted into evidence. Yet, the jury requested to see only the text messages between Appellant and her daughter and then returned a guilty verdict less than 90 minutes later.[8]

---

[8] Appellant classifies the texts with her daughter to be the most harmful. But she also argues that text messages between her and a parent of another child, as well as information retrieved from her computer, were also harmful. The gist of the texts between Appellant and the other parent on June 10 was regarding a detective who was contacting parents during the investigation. Appellant communicated to the parent that when speaking to the detective "don't mention medicine then give him your thoughts on me." She reiterated to the parent, "[r]emember, I don't give medicine." On June 12, Appellant asked her to call presumably to find out what she had told the detective. The parent testified she ceased communications with Appellant because she was directed to.

Retrieved from the computer tower was a screenshot of text messages from C.F.'s mother dated February 20, 2013, 6:16 a.m. C.F.'s mother advises Appellant that C.F. is running a fever possibly related to vaccines. The mother informs Appellant she gave C.F. Motrin at 3:30. A second image retrieved from the computer is a copy of C.F.'s autopsy report. The findings show "[t]oxic effects of diphenhydramine" with the manner of death as "[u]ndetermined."

11

Given the length of the trial and number of exhibits, we cannot say with assurance that the jury did not assess great weight on the text messages or whether they moved the jury from a position of non-persuasion to persuasion.

Evaluating the entire record in a neutral manner, we find the trial court's erroneous admission of evidence from Appellant's electronic devices demonstrates a reasonable possibility the error was a contributing factor to her conviction and punishment. We further find the State did not establish its burden to show the error did not contribute to the defendant's conviction or punishment beyond a reasonable doubt. *Williams*, 958 S.W.2d at 194 n.9. This Court cannot say beyond a reasonable doubt that the error did not contribute to the conviction or punishment. TEX. R. APP. P. 44.2(a). We sustain Appellant's issue challenging the trial court's denial of her motion to suppress.

## CONCLUSION

The trial court's judgment is reversed, and the cause is remanded to the trial court for further proceedings.

Alex Yarbrough
Justice

Do not publish.

12