

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| JOEL ANGEL LOPEZ, | § | No. 08-21-00170-CR |
| Appellant, | § | Appeal from the |
| v. | § | 413th Judicial District Court |
| THE STATE OF TEXAS, | § | of Johnson County, Texas |
| Appellee. | § | (TC# DC-F201900041) |

**O P I N I O N**

Appellant Joel Angel Lopez appeals his conviction for one count of aggravated sexual assault of a child (Count 1), and three counts of aggravated sexual assault of a child, habitual (Counts 2, 3, and 4), pursuant to TEX. PENAL CODE ANN. § 22.021(a)(2)(B), and one count of indecency with a child by sexual contact, habitual (Count 5), pursuant to TEX. PENAL CODE ANN. § 21.11(a)(1). The trial court sentenced Lopez to five life sentences, with each sentence to run concurrently. In two issues, Appellant complains of evidentiary rulings made during the guilt-innocence phase of the jury trial. We affirm.[1]

---

[1] This case was transferred from our sister court in Waco (10th District), and we decide it in accordance with the precedent of that court to the extent required by TEX. R. APP. P. 41.3.

## I. BACKGROUND

### A. The investigation

Just after midnight on the morning of November 19, 2018, Sheriff's Deputy Aaron Glenn and his partner, Sheriff's Deputy Cory Anderson, responded to a call regarding a verbal disturbance and a possible sexual assault. Portions of a recording of the 911 call were admitted and played for the jury. Andrea McGaughy, who sounds distraught and at times hysterical, can be heard telling the operator that her 11-year-old daughter, G.B.,[2] reported to her that Lopez had gone into her daughter's bedroom and "licked her butt," while her daughter had been asleep. McGaughy described that Lopez had been staying with the family. She told the operator that Lopez claimed he had not done anything, but G.B. would not tell her a lie. McGaughy went on to say that G.B., who had "never . . . ever been touched, would have told [McGaughy] if she was, and [G.B.] just told her sister, and her sister came right to [McGaughy]."

Along with the 911-call, portions of Deputy Glenn's body-camera recording of the on-scene investigation was also admitted and played for the jury. The recording shows the deputies questioning Lopez, Maggie Van Zandt, and G.B.'s parents who were all present on scene, and further shows the deputies gathering potential forensic evidence from the home. After *Miranda* rights are read to Lopez, and he agrees to answer questions, he can be heard denying the allegations, claiming he was asleep on the couch with Van Zandt before he was awoken by the commotion in the home. Lopez says, "they were saying some crazy sh*t."[3]

---

[2] In accordance with Texas Rule of Appellate Procedure 9.10 (a)(3), we refer to the child complainant and any other child witness by their initials only.

[3] The jury was instructed that the body-camera video was admitted for the limited purpose of demonstrating the investigative process in the case but was not to be used for the truth of any statements asserted therein.

## B. The SANE exam

When officers left the scene, G.B. was transported to Cook Children's Medical Center for an examination by a sexual assault nurse examiner (SANE). Theresa Fugate, the SANE nurse, testified at trial regarding her examination of G.B. Also, her report was admitted into evidence, without objection. Fugate read to the jury G.B.'s reporting of what happened, as stated in her own words, as follows:

> I was sleeping in my bed, and he came in my room. I was facing the wall, and he pulled my pants and underwear down and started licking me down there (and points to her genital area). And he licked my bottom hole too. I was scared, I didn't know what to do. I just didn't move and kept my eyes closed. Then he left . . . . He came back in and did the same thing, but then he put his finger in my hole down there (points to genital area), and he said, 'You know you like it.' That really freaked me out. He kept leaving and coming back in like four or five times. He also kissed up here (breast, she was pointing to) and put his mouth on my nipples and my neck and ear. I told my sister. Then we told my mom.

## C. The physical evidence

Forensic DNA Analyst Rachel Burch testified regarding the DNA analysis of the SANE kit and the buccal swabs collected from Lopez. DNA comparison revealed that Lopez and any patrilineal relative (i.e., his father or son) could not be excluded as a contributor of the DNA profile extracted from the epithelial and sperm cells obtained from the crotch area of G.B.'s underwear, such that 99.937% of the U.S. population other than Lopez would not be expected to be a contributor of the DNA profile. Similarly, Lopez (and any patrilineal relative) could not be excluded as the contributor of the DNA profile extracted from epithelial cells (which could come from saliva) contained in G.B.'s anal swab, such that 99.943% of the U.S. population, exclusive of Lopez, would be expected to be a contributor. In other words, Lopez's DNA was among less than 1% of the U.S. population that could be a contributor to DNA profiles extracted from the

underwear segment and anal swabs. Burch expressed a 95% confidence level in the DNA comparison results.

**D. G.B.'s in-court testimony**

At trial, G.B., who was then fourteen years old, testified about the events leading to the charges. The night in question, her older sister, Z.B., was staying at their aunt's house. G.B. was sleeping on the couch next to the bunk bed. Lopez first came into her room to ask if she wanted the music left on, then left. About five to ten minutes later, G.B. described, while crying, that Lopez came back into her room, got on his knees, took her pants and underwear off, and started licking her vagina. She felt his tongue go in and out of her vagina and felt his beard on her inner thighs. After Lopez exited the room, G.B. pulled up her pants and kept her eyes shut as she wept. G.B. repositioned herself to face the back of the couch. Lopez returned to the room a third time, rolled G.B. over, removed her pants and licked her "vagina again, but he also licked [her] butt," which felt "horrible." She recalled that Lopez smelled like alcohol.

After a couple of minutes, Lopez left the room, and G.B. once again pulled up her pants, this time attempting to wedge herself underneath the cushions on the backrest of the couch. Roughly twenty minutes later, Lopez came back to the room yet again, pulled down G.B.'s pants, moved his tongue in and out of her vagina, put his fingers inside her vagina, pulled up her shirt and bra, and squeezed her breasts. G.B. could tell Lopez used his finger because she felt a nail poking her, which hurt. Lopez whispered in her ear, "I know you like it," which made her cry even more. Lopez left and came back a fifth time, pulled down G.B.'s pants and licked her vagina again, but this time his tongue did not go inside of it. Lopez then pulled up G.B.'s pants and left the room. G.B. pulled up the covers and cried herself to sleep.

4

G.B. testified she did not tell her parents the next day because she felt scared that Lopez would hurt her again. However, she told Z.B. what happened the following night, and Z.B. told her parents, who then called the police. G.B. positively identified Lopez in court as the perpetrator.

On cross-examination, defense counsel asked G.B. with whom she had spoken about the offenses prior to trial. G.B. stated she had spoken to her sister (Z.B.), her brother, the SANE nurse, the "lady at the Child Advocacy Center," and her two best friends at school. Regarding her interview at the Child Advocacy Center (CAC), counsel elicited from G.B. the following:

[Defense counsel]: Did you tell her everything?

[G.B.]: Yes.

[Defense counsel]: Did you leave anything out?

[G.B.]: No, I'm pretty-also pretty sure that they took us to another lady or something and talked about therapy or something.

. . . .

[Defense counsel]: I'm sorry the [CAC], the lady with the white board that she wrote on with paper on it, she tore off. Do you remember her?

[G.B.]: I don't remember her exactly, but I know I was there.

. . . .

[Defense counsel]: Now, is there a reason why you didn't tell the lady at the CAC interview that Joel had put his tongue in your vagina?

[G.B.]: Because I was a little kid and I didn't know anything about what that was, but I did feel it and I did tell my sister everything and so she knew. But I was a little kid. She really didn't know what that was either. We just knew what happened.

5

When counsel asked G.B. if she had told the SANE nurse about oral penetration of her vagina, G.B. responded, "no" and explained that her mother did not want to "share this to the whole world" and was "lowkey about it." Thereafter, upon re-direct examination, G.B. again recounted the events of the night in question, consistent with her prior testimony.

## E. Z.B.'s in-court testimony

Fifteen-year-old Z.B. testified that in November 2018, G.B. told her a "secret" while "balling [sic] her eyes out." G.B. told Z.B. that Lopez had touched her the night before and "did things with his tongue and his fingers." Regarding what G.B. specifically told her about the assault, Z.B. recounted that G.B. said Lopez "was basically, like, sticking [] his tongue inside her, inside of her vagina area, and that's, like, basically what she told me."

## F. The forensic interview

In response to the cross-examination of G.B. regarding her purportedly inconsistent statements during the CAC forensic interview, the State offered, and the court admitted into evidence under the rule of optional completeness, the video recording of G.B.'s CAC interview. *See* Tex. R. Evid. 107.

Prior to the publication of the video to the jury, forensic interviewer Kacie Hand testified regarding her general educational and professional background, as well as the general procedures and protocols she followed while conducting a forensic interview of a child. Interviewer Hand explained that a forensic interview is a "nonleading, nonbiased interview where an interviewer and a child are in one room, and in another room on closed-circuit TV it is being recorded for the team, which consists of law enforcement, CPS, the District Attorney's Office, County Attorney's Office, and Juvenile Services." Hand also claimed the CAC was a neutral place for a child to tell their story about an event in his or her life. The interview, Hand said, is prefaced by a discussion of

6

various parameters meant to put the child at ease ("rapport building") and understand that they may relate their story freely and openly, such that the child may be more likely to correct the interviewer's understanding of the facts if he or she has misconstrued or misunderstood them. During these discussions, the interviewer establishes the child's distinction between a truth and a lie to "determine the child's understanding, to see their cognitive ability." The child can tell his or her story "in their own words" after being prompted by an open-ended statement, such as, "tell me why you're here today," and is allowed to speak as much or as little as they like, at which point the interviewer may ask follow-up or clarification questions. During her court appearance, Hand neither offered testimony about what G.B. told her nor did she express an opinion on G.B.'s credibility.

Various segments of the November 26, 2018, forensic-interview videorecording were published to the jury: G.B. described the composition of her household and related that she was eleven years old, was in the sixth grade, and liked going to school. G.B. summarized the difference between a truth and a lie: "A lie is something that you make up to hide the truth, and the truth is like, the real thing that happened." Hand told G.B. that she defined "truth" as "saying everything that happened and not leaving anything out;" G.B. agreed to tell the truth. G.B. soon explained she was brought to the CAC because someone touched her.

Unlike her trial testimony, G.B. said to Hand it was either "every time" Lopez came into her room or "like, two times" that Lopez whispered in her ear that he "knew she liked it." In describing what she wore the night of the assault, G.B. described she was wearing grey leggings with pink flowers on them, not shorts, as she testified at trial. She also said it was Lopez (not herself) who pulled up her clothes each time before leaving her room.

7

G.B. stated Lopez "opened up [her] butt" and licked her "pee-pee and [her] butthole" and came into her room multiple times. While G.B. testified Lopez had whispered in her ear, G.B. additionally told the interviewer that Lopez bit her ear before doing so. On the recorded interview, G.B. said Lopez stuck his finger "up there" in her "pee-pee." She thought it was the second or third time that Lopez came into her room that he put his finger inside her vagina, though she was not sure.

When asked during her interview how Lopez acted when he drank, G.B. replied, "like, crazy," and relayed that her mother once told her Lopez "got buck naked" and "laid on one of our beds" while she and Z.B. were out of the house. G.B. did not otherwise describe whether Lopez had put his tongue in her vagina in the recorded interview.

## G. Lopez's defense

### 1. Van Zandt's trial testimony

In support of his defense, Lopez presented the testimony of Maggie Van Zandt, who testified she had a romantic relationship with him that spanned ten years. Van Zandt mentioned at trial that her son was then nine years old.[4] Van Zandt, who stayed at the McGaughy house on weekends, testified that on the night in question, she and Lopez had sex on the couch in the living room then fell asleep. Van Zandt claimed she generally did not sleep well at night, that she was overall a light sleeper, such that if Lopez had gotten up at night, it would have woken her up. Van Zandt testified Lopez was a heavy sleeper, especially when he drank, and that night, Lopez was drunk. She further described that she and Lopez had sex in the McGaughy house many times, including on G.B.'s and Z.B.'s bed when the girls were not there. They had sex on the girls' bottom

---

[4] In one instance of our record, Van Zandt responds affirmatively when Lopez is referred to as her husband. Yet, in other parts of the record, other parties refer to her as either Lopez's girlfriend or his wife. To simplify our presentation, we refer to Van Zandt by her name only.

8

bunk bed about a week before the night in question, and Lopez did not wear protection. The next morning (the date of the outcry), she observed G.B. to be "[p]erfectly fine and happy and cheery like she always is." She testified that she became upset at Lopez at some point after the police arrived and had indicated she did not want to leave with him but explained that it was only "[o]ut of frustration, anger, [and] confusion." Ultimately, she testified she had decided to leave with Lopez because she "kn[e]w he didn't do it."

During cross-examination, Van Zandt first testified she did not know what time she and Lopez had sex but it was sometime after 11:00 p.m. Later, she testified she and Lopez had sex on an air mattress next to the couch (not on the couch, as she previously stated) sometime after 3:00 a.m. for thirty to forty minutes. Their son was asleep on a different couch in the living room, across from the mattress. Van Zandt woke up on the couch around 7:00 a.m. but did not remember when or how she moved to the couch from the air mattress. When she awoke, Lopez was asleep on the air mattress. Van Zandt admitted she was unaware of the SANE exam's DNA results.

### 2. Lopez's trial testimony

Lopez took the stand in his defense. He denied having committed the offenses and testified he got along well with G.B. and her siblings and loved them like they were his own nieces and nephew. Lopez testified that on the night in question, he and Joseph Brown, G.B.'s stepfather, had been drinking inside and outside of the house. Around 8:00 or 9:00 p.m., they lit a bonfire and continued to drink. For the first time, Lopez claimed he and Brown left the house around midnight to get more beer, and on the way back, they encountered someone who needed a ride, which they provided. Thereafter, around 2:00 a.m., they tried to go four-wheeling on some private property, but the gate to the property was locked, so they just drove up and down a dirt road. Lopez did not remember what time he went back into the house that night but stated he and Brown stayed up to

9

drink some more, and the noise woke up Van Zandt, so she joined them. Eventually, they all turned in for the night at around 4:00 a.m., at which point, he and Van Zandt had sex for either thirty minutes or an hour-and-a-half. Afterwards, they went outside to smoke cigarettes, went back into the house, and went back to sleep. Lopez testified he did not wake up until 8:00 a.m. Contrary to Van Zandt's testimony, Lopez claimed he and Van Zandt had sex the night before G.B.'s outcry and that he (Lopez) had not started drinking at 11:00 a.m. the morning of November 18, 2019 (as Van Zandt claimed) because he had been at work. Lopez asserted the sperm found on G.B.'s underwear "[c]ould've came from anywhere in the house [because he] had sex in that house multiple places."

### 3. Lopez's jury argument

Regarding the recording of the CAC interview, Lopez argued to the jury that, "[a]lthough it was only a week later," G.B. "didn't look upset. She was calm. She seemed cheerful, kind of happy. Had no problem answering any of the questions. Didn't seem upset by a single one of them. Not a one." Lopez also contended G.B. made statements during her interview that "weren't exactly correct," like when she stated Brown rarely drank, when in fact, he and Lopez were "drinking buddies;" or when she claimed she slept on the top bunk, when Z.B. testified it was Z.B. who slept on the top bunk and G.B. herself testified that the bottom bunk "was always [hers]." In support of his attack on the reliability of the DNA results, Lopez also pointed to G.B.'s assertion during the interview that McGaughy once told G.B. that Lopez had gotten naked and got on her bed when he was drunk. As to G.B.'s motivation for purportedly fabricating the accusations against him, Lopez relied on one of G.B.'s statements during the CAC interview, arguing to the jury that G.B. simply "didn't like the idea of her mother telling her that [Lopez] had been naked and having sex in her

10

bed, and she felt that was just icky, horrible, awful, and she wanted to make sure it didn't happen again. What better way to not make it happen again than to get him out of the house[?]"

The jury found Lopez guilty on all counts. Lopez pleaded "true" to each of the State's punishment-enhancement allegations, and after hearing punishment evidence, the jury assessed punishment for each count at confinement for life. The court sentenced Lopez in accordance with the jury's verdicts, and this appeal followed.

## II. ISSUES ON APPEAL

In two issues, Lopez asserts the trial court erred in admitting: (1) the testimony of Kacie Hand; and (2) the videotaped, forensic interview of G.B. (State's Exhibit 8). Because the first issue is predicated on the second issue, we proceed in reverse order and address the second issue first.

## III. THE ADMISSIBILITY OF G.B.'S INTERVIEW AT THE CAC

In his second issue, Lopez argues the trial court erred in admitting G.B.'s recorded interview, asserting it constituted inadmissible hearsay that operated to "bolster" trial testimony. The State counters that Lopez had insinuated, throughout his cross-examination of G.B., that there was a significant inconsistency between her trial testimony and her CAC interview regarding whether Lopez had penetrated her vagina with his tongue. Through counsel's questioning, the State contends, defense counsel insinuated that an inconsistency in G.B.'s testimony suggested she had fabricated her allegations against Lopez due to improper influence from others. At trial and on appeal, the State argues it became necessary to admit the recorded interview in its entirety, after defense counsel's questioning of G.B., to counter the false impression he had created about her prior statement.

11

## A. Standard of review

We review a trial court's decision to admit evidence under an abuse-of-discretion standard. *Walters v. State*, 247 S.W.3d 204, 217 (Tex. Crim. App. 2007). The trial court abuses its discretion only when the decision lies outside the zone of reasonable disagreement. *Id.*

## B. Applicable Law

"Hearsay is a statement, other than one made by the declarant while testifying at trial or hearing offered in evidence to prove the truth of the matter asserted." *Pena v. State*, 353 S.W.3d 797, 814 (Tex. Crim. App. 2011) (citing TEX. R. EVID. 801(d)). "Hearsay statements" are generally not admissible "unless the statement falls within a recognized exception to the hearsay rule." *Pena*, 353 S.W.3d at 814. One such exception is provided by TEX. R. EVID. 107, otherwise known as "the rule of optional completeness." *Id.* In relevant part, this rule provides:

> If a party introduces part of an act, declaration, conversation, writing, or recorded statement, an adverse party may inquire into any other part on the same subject. An adverse party may also introduce any other act, declaration, conversation, writing, or recorded statement that is necessary to explain or allow the trier of fact to fully understand the part offered by the opponent.

TEX. R. EVID. 107. The rule is one of admissibility, permitting courts to introduce "otherwise inadmissible evidence when that evidence is necessary to fully and fairly explain a matter 'opened up' by the adverse party." *Walters v. State*, 247 S.W.3d 204, 218 (Tex. Crim. App. 2007). As designed, rule 107 reduces "the possibility of the jury receiving a false impression from hearing only a part of some act, conversation, or writing." *Id*. It does not permit the introduction of other similar, but inadmissible, evidence unless it is necessary to explain properly admitted evidence. *Id.* Finally, "the rule is not invoked by the mere reference to a document, statement, or act." *Id.*

12

## C. Analysis

Lopez complains the admission of G.B.'s recorded interview—which was admitted after the State invoked a right to completeness under TEX. R. EVID. 107—was erroneous because the State failed to demonstrate that Lopez's cross-examination of G.B. had created a false impression with the jury, and Lopez had not first sought to admit any part of the interview. Lopez argues rule 107 did not apply. And in permitting the State to play the entire interview for the jury, Lopez contends the trial court admitted hearsay evidence offered by the State to "bolster" the credibility of G.B.'s trial testimony, thereby depriving him of a fair trial.

"Bolstering" occurs when evidence is admitted for the sole purpose of convincing the fact finder that a "particular witness or source of evidence is worthy of credit, without substantively contributing to make the existence of a fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." *Cohn v. State,* 849 S.W.2d 817, 819-20 (Tex. Crim. App. 1993) (quoting TEX. R. EVID. 410); *see also Rivas v. State*, 275 S.W.3d 880, 886 (Tex. Crim. App. 2009) (explaining that "bolstering" objections are inherently ambiguous because law concerning bolstering predates promulgation of rules of evidence and implicates several evidentiary rules).

Here, assuming without deciding whether the trial court erred in applying the rule of optional completeness, we conclude the record does not support a finding that the admission of this evidence had the impermissible effect of bolstering G.B.'s credibility or that it had more than but a slight effect on the jury's verdict. *See Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002) (directing that non-constitutional error must be disregarded if the appellate court, after reviewing the record as a whole, has fair assurance that the error did not influence the jury or had but a slight effect).

13

We examine the bolstering claim, and perform a harm analysis as well, regarding the admission of the complained-of recorded interview.

## 1. No evidence of impermissible bolstering of G.B.'s credibility

In arguing that the recorded interview deprived him of a fair trial by impermissibly bolstering G.B.'s testimony and credibility, Lopez does not direct us to any part of the record or any legal authority in support of his claim. Nor does he specifically identify which statements made during the recording improperly bolstered G.B.'s credibility or what those statements purportedly bolstered. *See Rivas v. State,* 275 S.W.3d 880, 886 (Tex. Crim. App. 2009) (explaining that "bolstering" objections are inherently ambiguous because law concerning bolstering predates promulgation of rules of evidence and implicates several evidentiary rules). Nonetheless, in the interest of justice, we construe his argument as asserting the recording of the child's interview improperly bolstered her trial testimony about Lopez's sexual assault of her.

First, we examine whether the complained-of recording could have harmed Lopez in the manner specifically alleged, namely, by bolstering G.B.'s credibility. We note that during his argument to the jury, Lopez pointed to various inconsistencies between G.B.'s recorded interview and her trial testimony. For example, defense counsel argued that G.B. claimed Brown rarely drank, when in fact he and Lopez were "drinking buddies," or how she claimed she slept on the top bunk but claimed at trial she slept on the bottom one. And our own review of the record shows that G.B.'s recorded interview contradicted her trial testimony on other points, such as how many times Lopez whispered in her ear, whether Lopez also bit her ear, what she was wearing the night of the assault, and whether it was she or Lopez who pulled up her pants each time he left her room.

Further, as we previously discussed, when confronted on cross-examination with her failure to tell interviewer Hand that Lopez put his tongue in her vagina (like G.B. testified before

14

the jury), G.B. attempted to explain, but did not deny, her previous failure to make that specific allegation. She also admitted she did not tell nurse Fugate about Lopez having orally penetrated her vagina, which admission was corroborated by the SANE medical report. G.B. told nurse Fugate that Lopez put his finger in her vagina but never mentioned his tongue. As Lopez contended during his cross-examination, the recording of G.B.'s interview did not, in fact, indicate that G.B. had said Lopez put his tongue in her vagina at any point during the interview.

Thus, rather than "bolstering" G.B.'s testimony by somehow demonstrating that G.B.'s testimony was worthy of credit (because it was consistent with her CAC interview), the recording served to confirm Lopez's impeachment of G.B. by putting before the jury extrinsic evidence of G.B.'s prior statements inconsistent with her testimony. That is, the video corroborated Lopez's contention that G.B. had made a new allegation at trial that she had not made before, which in turn, as discussed below, he used to support his theory of fabrication. Thus, the recording did not constitute impermissible bolstering. *See Hernandez v. State*, No. 03-07-00040-CR, 2010 WL 391850, at *16 (Tex. App.—Austin Feb. 5, 2010, no pet.) (mem. op., not designated for publication) (holding videotape of child-victim's forensic interview did not constitute impermissible bolstering where it depicted statements contradicting her testimony).

## 2. Harmlessness of the recorded interview

As discussed, our review of the record shows the recorded interview supported, rather than undercut, Lopez's impeachment of G.B., in turn helping support Lopez's defensive theory of fabrication on G.B.'s part. That the jury ultimately rejected Lopez's theories does not convince us the videotape deprived him of a fair trial by affecting his substantial rights—our task is to assess the likelihood that the jury's decision was adversely affected by the error, if any, in admitting the video, and we must do so in light of the record as a whole, including the testimony, the parties'

15

theories of the case, any physical evidence, and closing arguments. *See Motilla*, 78 S.W.3d at 355-56 (in evaluating harm for non-constitutional error, appellate court considers record as a whole, including the testimony, the parties' theories of the case, any physical evidence, and closing arguments); TEX. R. APP. P. 44.2(b) (non-constitutional error must be disregarded unless it affects appellant's substantial rights).

Lopez urges the admission of the recorded interview harmed him because "[w]atching video of a more comfortable, more at-ease young lady in the company of an interviewer asking her leading questions convinced the jury that perhaps these allegations were true." But Lopez does not explain how this was so. Indeed, Lopez argued otherwise to the jury—Lopez emphasized to the jury that G.B. did not appear to be upset by any of the questions posed by interviewer Hand during the interview and that, instead, G.B. appeared to be happy and cheerful despite the short span of time between the interview and the alleged assaults. Lopez then made further favorable use of the recording when he argued to the jury that it provided a vital clue about G.B.'s possible motivation for fabricating the allegations against him: G.B.'s vexation with Lopez for his reportedly prior inappropriate behavior when he got on G.B.'s bed, naked, while he was drunk. Lopez argued that G.B. found this to be "icky," "horrible," and "awful," which he claimed, motivated her to "get [him] out of the house" by fabricating the allegations against him.

Given the corroborative (rather than conflicting) effect on Lopez's impeachment of G.B. and general defensive theory, in light of the evidence uncovering Lopez's DNA in the crotch segment of G.B.'s underwear and anal swabs collected during the SANE exam, the overall consistency of G.B.'s allegations during her SANE examination and her trial testimony, as well as Lopez's testimony relating a different series of events (at times contradicted by Van Zandt) than that previously presented to police during the police-body-camera footage, we have a fair

16

assurance that error, if any, in admitting the recording did not influence the jury or had but a slight effect. *See Motilla*, 78 S.W.3d at 355 (directing that non-constitutional error must be disregarded if the appellate court, after reviewing the record as a whole, has fair assurance that the error did not influence the jury or had but a slight effect).

Accordingly, we overrule Issue Two.

## IV. THE ADMISSIBLITY OF KACIE HAND's TESTIMONY

In his first issue, Lopez contends the trial court erred in admitting Kacie Hand's testimony about the general procedures and protocols she followed while conducting a forensic interview of an alleged child-victim. Similar to his second issue, Lopez asserts Hand's testimony was impermissibly admitted because it was hearsay that served to bolster G.B.'s testimony. In this regard, Lopez contends the State's use of interviewer Hand as a "human lie detector" deprived him of a fair trial. [5]

On review of the record, we have failed to uncover anything that demonstrates Hand offered hearsay testimony in the first instance or "bolstered" G.B.'s testimony. Indeed, Hand's testimony is devoid of any reference to any out-of-court statement made by G.B., either during the interview, or otherwise. *See* TEX. R. EVID. 801(d). We find nothing in the record to support Lopez's contention that Hand's testimony—that she conducted her interview in a "nonbiased and nonleading" manner after assessing the alleged child-victim's "cognitive ability" by reviewing the importance of distinguishing between the truth and a lie—amounts to the State's use of Hand as a "human lie detector." *See Beard v. State*, No. 10-11-00296-CR, 2012 WL 662333, at \*3 (Tex.

---

[5] The State contends Appellant did not object at trial on hearsay or "bolstering" grounds and urges us to overrule this issue as waived. Our review of the record shows that Appellant did object to Hand's testimony on these grounds, and thus we refuse to hold that Lopez waived his appellate claims in this regard.

App.—Waco Feb. 29, 2012, pet. ref'd) (mem.op., not designated for publication) (overruling appellant's "bolstering" claim of error where doctor testified child-complainant's statements regarding appellant's sexual abuse of her to be "reliable," that he would use the term "reason to believe" to characterize the reliability of the child's statements, and that "there's reason to believe that her words should be taken seriously," holding that doctor's statements were not a direct opinion on child's truthfulness). Lopez does not direct us to anything in the record or existing law that supports his claims in this regard. And while Lopez, citing to *Duckett v. State*, 797 S.W.2d 906, 915 (Tex. Crim. App. 1990), correctly points out that the State may not "cross the line and have its expert give a direct opinion on the truthfulness of a child," he concedes that Hand "did not offer a direct opinion on G.B.'s truthfulness."

Again, our careful review of the recorded interview shows that it corroborated Lopez's impeachment of G.B. via prior inconsistent statements regarding not only whether Lopez put his tongue inside her vagina, but also as to several other details she spoke about the events in question. As such, even if, as Lopez asserts, Hand's testimony bolstered the credibility of the statements G.B. made during the recorded interview, it would only show that G.B.'s interview statements—to the extent they contradicted her trial testimony—were truthful and worthy of credibility over G.B.'s more severe allegations at trial.

Because we fail to see how any error in admitting Hand's testimony about the general procedures and protocols followed while interviewing G.B. affected Lopez's substantial rights, we conclude that no harm was shown. *See Motilla*, 78 S.W.3d at 355; *see also* TEX. R. APP. P. 44.2(b).

Accordingly, we overrule Issue One.

## V. CONCLUSION

We affirm.

18

GINA M. PALAFOX, Justice

November 14, 2022

Before Rodriguez, C.J., Palafox, and Alley, JJ.

(Do Not Publish)